GAVITT, Respondent, vs. MOULTON, Appellant.

*May 13—September 8, 1903.*

*Wills: Testamentary capacity: Undue influence: Loss or destruction: Evidence.*

1. In a proceeding for the establishment and probate of a will which had been lost or destroyed, the evidence (stated in the opinion) is *held* sufficient to sustain a finding that the testator was of sound mind at the time the will was executed.
2. A will made no provision for the wife of the testator, to whom he had been married about a year before, when he was eighty-one years old, and from whom he had been estranged. It gave the bulk of his property to Mr. and Mrs. G., with whom he had

long been on terms of intimate friendship, and the balance to his nieces and nephew. Upon a contest by the wife it appeared, among other things, that, on hearing of testator's illness, G. had come from Chicago to see him the day before the will was executed, and that testator's wife and the nurse were excluded from the room when the will was executed. There was no evidence that G. exerted or attempted to exert any influence over the testator to induce him to make the will, and the undisputed evidence showed that the will expressed the wishes of the testator at that time. G. returned to his home in Chicago, and the testator lived nearly two years thereafter without revoking or changing the will. *Held*, that a finding that the testator was not, at the time of making the will, under the undue influence of G. or any other person, was sustained by the evidence.

3. Where a will was last known to be in the possession of the testator and cannot be found upon his death, the presumption is that he destroyed it with the intention of revoking it.

4. The mere fact that the contestant in such case had an opportunity to destroy the will is not, of itself, sufficient to overcome the presumption that the testator destroyed it with intent to revoke it, but it is a circumstance to be considered with other proof.

5. Declarations of the testator showing that he believed he had possession of his will up to a time shortly before his death are admissible as tending to show that the will had been lost by accident or destroyed by the design of others.

6. The evidence in this case—including such declarations of the testator and showing, among other things that the contestant, testator's wife, from whom he was entranged and for whom no provision was made in the will, had access to his rooms and papers for several days before his death, while he was unconscious; that such papers were scattered about; and that immediately after his death she carried away a part of such papers, and refused to return them until compelled to do so— is *held* to sustain a finding to the effect that the will had been lost by accident or destroyed by design of some person other than the testator.

APPEAL from a judgment of the circuit court for Green Lake county: GEORGE W. BURNELL, Circuit Judge. *Affirmed.*

On August 1, 1900, *George Gavitt* presented to the county court for Green Lake county his verified petition stating, in

effect, that H. C. Moulton, of Berlin, in that county, died July 8, 1900, leaving an estate therein to be administered; that the deceased left no children him surviving and was never married; that he left the five persons therein named as next of kin and heirs at law of the said estate as therein mentioned; that the deceased left a will (the substance of which is therein stated), duly executed on or about September 12, 1898, which will was therewith presented and propounded as his last will and testament by the petitioner as the executor named therein; that said will was lost or destroyed by design in the manner and under the circumstances therein stated; that one *Anna Bachlinsky (Moulton),* claiming to be the widow of the testator, as therein charged, in effect, destroyed the will after the death of the testator; that one H. R. Laing was appointed special administrator of said estate July 20, 1900, on the petition of this petitioner; that Laing thereupon demanded all papers belonging to the estate of and from the said *Anna,* but failed to get such will; that at the time of the death of the testator there was pending in the circuit court an action brought by him against said *Anna* to cancel an alleged fraudulent marriage certificate and the record of such marriage certificate; that the testator ordered said *Anna,* who was a person of ill repute, from his premises, and did what he could to keep her therefrom, and had her expelled by process of law and arrest; and said petition prayed that proof of the contents of the will be taken, and the same proved and allowed as the last will and testament of said deceased, and letters testamentary thereupon be issued to said petitioner. Such proceedings were had upon such petition that an order, judgment, and decree was duly entered in the county court December 3, 1901, establishing, allowing, and admitting to probate such written instrument as the last will and testament of said deceased, and thereupon, and on December 12, 1901, the said *Anna* duly appealed therefrom to the circuit court.

The cause was thereupon tried in that court without a jury, and after the close of the trial and due consideration the court, on June 10, 1902, made and filed its findings, wherein it was found as matters of fact, in effect, (1) that H. C. Moulton died at the city of Berlin July 8, 1900; (2) that he was then an inhabitant and resident of that city, (3) and of full age and of sound mind; (4) that on or about September 10, 1898, at the city of Berlin, the said H. C. Moulton made and signed his will in writing in the form and manner provided by law; (5) that said instrument and will was at the time—September 10, 1898—duly attested and subscribed by Perry Niskern, B. F. Dodson, and Bert Wood, who were competent witnesses thereto, in the presence of the said H. C. Moulton and in the presence of each other, and the said H. C. Moulton at the time declared the same to be his will, and requested said witnesses above named to subscribe the same as subscribing witnesses; (6) and the same was in all things duly executed by the said H. C. Moulton as his last will and testament; (7) that he was not at the time under the undue influence of the proponent, *George Gavitt,* or any other person or persons, and that said will was so made and executed by him, the said testator, freely and voluntarily of his own motion, and was the expression of his own mind and will and desire; (8) that said will was never revoked, and was either lost by accident or destroyed fraudulently by design or fraudulently suppressed by some other person than the said H. C. Moulton previous or subsequent to the decease of the said H. C. Moulton; (9) that said will was last seen in the possession of the testator a short time and within about a month prior to his decease; (10) that the said H. C. Moulton was upwards of eighty years of age, careless in keeping his papers, and that just before his death he became unconscious, and so remained for several days prior to his death; (11) that during the time he was so unconscious the said *Anna,* claiming to be the wife of the said H. C. Moulton, had access to

his papers and the rooms where he was then lying uncon-
scious, and that the papers were then in a scattered condition
throughout his room, part of them being on the floor and scat-
tered throughout the room, and that the said *Anna* imme-
diately after his death removed part of said papers of said
deceased from his rooms, and refused to return them to the
special administrator until compelled to do so by direction of
her attorney therein after a suit had been begun against her
by the said special administrator for that purpose; (12) that
not long before his death the said H. C. Moulton had declared
to divers persons that his will was so executed as aforesaid,
and as to different persons declaring it to be his will, but that
on a search of what papers could be found after his death—
being papers recovered of the said *Anna*—said will could not
be found, and the same appears to have been lost by accident
either by the said H. C. Moulton just prior to his death, or to
have been soon after his death destroyed by design or con-
cealed by some other person.   (13) The court further finds
that the provisions of said will were as follows, to wit:

"I, H. C. Moulton, of Berlin, Green Lake County, Wiscon-
sin, make, publish and declare this my last will and testa-
ment, hereby revoking all other wills by me made.

"1st. After the payment of my debts and funeral expenses,
I give, devise and bequeath to Mrs. Helen Van Kaughnet of
Turin, Lewis County, N. Y., the sum of one hundred dol-
lars, to be paid to her out of my estate.

"2d. I give, devise and bequeath to H. C. Moulton Riggs
of Turin, Lewis County, N. Y., the sum of one hundred dol-
lars.

"3d. I give, devise and bequeath to Gara Riggs of Turin,
Lewis County, N. Y., the sum of one hundred dollars.

"4th. I give, devise and bequeath to Mrs. C. W. Coulton
of Booneville, Oneida County, N. Y., the sum of one hundred
dollars.

"5th. I give, devise and bequeath to Mrs. Mary Berry of
Waukegan, Ill., the sum of one hundred dollars.

"6th. All the rest, residue and remainder of my estate

both real and personal, I give, devise and bequeath to *George Gavitt,* and Miriam Gavitt, his wife, of Chicago, Cook County, Illinois, to be equally divided between them.

"7th. I hereby nominate and appoint *George Gavitt* as the executor of this, my last will, and I ask that no bond be required of him by any court having the probating of the will.

"Whereas, one *Annie Bachinsky* is now claiming to be my wife, I take this occasion to say that I was never married to her or any other woman.

"Witness my hand and seal this 10th day of September, 1898.

"H. C. Moulton. [Seal.]

"The above instrument consisting of two and one-half pages of legal cap writing was on the day of the date thereof, to wit: Sept. 10, 1898, signed, published and declared by the said testator, H. C. Moulton, in our presence to be his last will and testament, and we at his request and in the presence of each other have subscribed our names thereto as subscribing witnesses.

"Perry Niskern.
"B. F. Dodson.
"Bert Wood."

And as conclusions of law, the court found, in effect, (1) that said will had been duly proved and established as the last will and testament of the said H. C. Moulton, and should be established, allowed, and admitted to probate as such last will and testament of said H. C. Moulton, deceased; (2) that the judgment of the county court should be affirmed in whole, and that the record should be remitted to the county court for further proceedings in the administration and settlement of said estate; (3) that the proponent should recover his costs and disbursements in this proceeding to be taxed, and such judgment for costs be docketed in the office of the clerk of the circuit court, and enforced as the judgment of that court in the manner provided by law.

Thereupon judgment was entered in the circuit court in favor of the proponent, *George Gavitt,* and against the contestant, *Anna Moulton,* in accordance with such findings of

fact and conclusions of law, and for $109.58 costs. From such judgment the said *Anna Moulton* appeals.

For the appellant there was a brief by *Bouck & Hilton,* and oral argument by *Gabe Bouck.*

For the respondent there was a brief by *Perry Niskern,* attorney, and *Thompson, Thompson & Pinkerton,* of counsel, and oral argument by *H. E. Thompson.*

CASSODAY, C. J. The statute gives to the county court "power to take proof of the execution and validity" of "any will of real or personal estate" which has been "lost or destroyed by accident or design," and "to establish the same." Sec. 3791, Stats. 1898. "The petition for the probate of such will" must, however, "set forth the provisions thereof." Id. That was done in the case at bar. "The same power" is thereby given to "the circuit court" "in an action brought for that purpose." Id. Of course, the fact that such will is not in existence and cannot be produced makes it necessary to prove its contents by secondary evidence. *Everitt v. Everitt,* 41 Barb. 385; *Southworth v. Adams,* 11 Biss. 256, 260. Such statute is in aid of the common law, and the proof of such contents may be made as at common law. *Harris v. Harris,* 26 N. Y. 433; *In re Kennedy's Will,* 167 N. Y. 172, 60 N. E. 442; 19 Am. & Eng. Ency. of Law, 563; *Hall v. Allen,* 31 Wis. 691. There is no question here but that the contents of the will were sufficiently proved. The attorney who drew it testified to its contents substantially as found by the court. His testimony is corroborated to some extent by the testimony of each of the other subscribing witnesses. So the formal execution of the will is sufficiently proved, and seems to be conceded. The probate of the will, however, is contested on three grounds. To appreciate the questions presented, a general outline of the situation seems to be necessary.

The testator had resided in Berlin for many years as a

bachelor. He occupied three rooms over a store. When he·
was well he took his meals at the hotel, and when he was
sick, or did not feel well, his meals were brought to him. His
principal business was loaning money on mortgage security,.
shaving notes, etc. He had no blood relatives nearer than
nephews and nieces, and they lived in New York and Illinois..
The contestant, *Anna,* had been married to one Bachinsky
several years ago, but was divorced from him some nine or·
'ten years before the trial of this action, and he subsequently
died. After the divorce she returned to Berlin, where she·
formerly lived. Mr. Moulton kept company with her before·
she was married to Bachinsky, and again and for several
years after her divorce. During that time, or a portion of'
it, she lived in a house belonging to Mr. Moulton. Septem--
ber 20, 1897, they were married by a justice of the peace in
Milwaukee county, who issued his certificate to that effect,.
with two subscribing witnesses. At the time of such mar-
riage Mr. Moulton was over eighty-one years of age. After·
such marriage she continued to occupy the house, the same
as before, and he continued to occupy the rooms over the
store, the same as before; but he made frequent visits to her
at the house, and she visited him at the rooms. A little more·
than a month after such marriage, and on October 25, 1897,
Mr. Moulton made his will, thereby purporting to give all'
his property to "his beloved wife," *Anna.* It appears that
September 7, 1898, Mr. Moulton had an attack of apoplexy,
and became unconscious for a little time; that on Septem-
ber 9, 1898, his mind was still in a dazed condition, but he·
was better—not unconscious—and became clear-headed, but
remained in bed, although he was able to talk and take nour-
ishment and answer questions put to him. That was on Sep-
tember 9, 1898. On September 10, 1898, he was up all day,.
or the most of the day, and his mind was sound during that
day. On that day he sent for his attorney, who went to Mr.
Moulton's rooms and found him there, up and dressed, sitting·

in a chair in the middle of the room; that he pointed to *Anna,* who was also there, and said she was claiming to be his wife, and it was all wrong, and he wanted him to get her out at once, and thereupon Mr. Moulton made an affidavit before a court commissioner for the arrest of *Anna* for unlawfully and wrongfully and by force and arms breaking into his rooms and doing damage therein. On that same day he requested his attorney to draw his will, saying to him that he wanted to leave some small legacies to different persons whose names he would furnish, and the balance of his estate he proposed to give to *Mr. George Gavitt* and his wife. The attorney subsequently received the memorandum in evidence, and drew the will, and the same was executed, as found by the trial court, about 5 o'clock on the afternoon of that day. As indicated in the foregoing statement, that will contains this clause:

"Whereas, one *Anna Bachinsky* is now claiming to be my wife, I take this occasion to say that I was never married to her or any other woman."

On October 8, 1898, *Anna* filed her verified petition for the appointment of a guardian for Mr. Moulton by reason of his alleged incompetency to do business. October 28, 1898, Mr. Moulton commenced an action against *Anna* to set aside and cancel the marriage certificate mentioned, and the record thereof, made September 29, 1898. The contestant, *Anna,* answered the complaint in that action, and alleged, among other things, that whatever secrecy there had been in respect to such marriage had been at the request of Mr. Moulton. That cause was still pending when Mr. Moulton died.

It appears that after the will was so executed, and on September 13, 1898, the attorney who drew it sealed it up in an envelope and indorsed thereon, "The last will of H. C. Moulton," and filed the same in the county court. August 14, 1899, Mr. Moulton withdrew the will from the county court, and told the attorney that he wanted to keep the will, but no

person ever saw the will itself afterwards. In November or December, 1899, Moulton showed the attorney the sealed envelope with the indorsement thereon—showed it to him several times. January 24, 1900, Moulton and another made a very thorough search for the will through the safe, the green box, the secretary, and papers, but could not find it. Mculton thereupon told his attorney that he had lost the will, and wanted him to draw another will like the former will, and stated the substance of it; but afterwards, and in April or May, 1900, Moulton told his attorney that he had found the will, and again showed him the envelope said to contain the will. After the execution of his will and until he died he remained feeble. July 3, 1900, Mr. Moulton was again taken sick. He was nervous, his right arm hanging down by his side, and he remained in a comatose condition until he died July 8, 1900. It appears from the inventory of the special administrator that the value of the whole estate was less than $7,000.

The probate of the will is contested upon three grounds:

1. Want of mental capacity on the part of H. C. Moulton to make a valid will at the time the will in question was executed. The requisite mental capacity to make a valid will has frequently and recently been stated by this court. *In re Downing's Will,* 118 Wis. 581, 95 N. W. 876, 879. A restatement of one quotation there made is sufficient for the present purpose.

"It is essential that the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were or should or might have been the objects of his bounty, and the scope and bearing of the provisions of his will." Id.

The undisputed evidence in the case at bar brings it within the rule stated. The testator sent for his attorney, and directed him to do certain things in respect to the contestant, *Anna,* mentioned in the foregoing statement of facts, and

thereafter told him that he wanted his will drawn; "that he wanted to leave some small legacies to different people," but that he could not just then state their names, "and the balance of his estate he proposed to give to *Mr. George Gavitt and his wife,*" and that he would give him "instructions as to the names later," and he did; and the attorney drew the will "in accordance with his instructions, and in accordance with the names so far as they were concerned." After the will was so drawn, the attorney read it over to Mr. Moulton in the presence of the other two subscribing witnesses, and he expressed himself as being satisfied with it, and that it was all right, and declared that it was his will, and signed the same in their presence, and requested the subscribing witnesses, including the attending physician, to subscribe their names thereto as such witnesses, which they did in his presence and in the presence of each other. All three of the subscribing witnesses testified that, in their opinion, Mr. Moulton was at the time of executing the will of sound mind; and the testimony of the attorney who drew the will, as to its contents, was corroborated to some extent by the other two subscribing witnesses. Counsel for the contestant virtually concede that the evidence is sufficient to sustain the finding of the court that Mr. Moulton was of sound mind at the time of executing the will.

2. Nevertheless, counsel very properly contend that his weakened mental and physical condition should be considered in determining whether the will was procured by fraud and undue influence. As indicated by the facts stated, the circumstances were peculiar. He was an old man with no blood relations nearer than nephews and nieces, and they lived far from him. His relations with the contestant, *Anna,* were peculiar and unnatural. The evidence is to the effect that he was married to her at the time and place stated. But they continued to live separately, occupying different buildings, the same as before, and continued frequently to visit

each other the same as before.   The contestant concedes that
the marriage had been kept secret at the request of Mr. Moul-
ton.   Manifestly, he became estranged from her prior to the
execution of the will; and, as indicated in the statement, he
forced her from his rooms, and took steps to have her ar-
rested.   That fact, and the fact that the nurse was excluded
from the room when the will was executed, is referred to as
evidence tending to prove undue influence.   Regarding her
as the wife of the testator, as we must on the evidence be-
fore us, still he had the legal right to make a will and leave
her out.   The important question is whether she was left out
of the will by reason of fraud or undue influence practiced
upon him by any person or persons.   Was it by reason of im-
portunities or flatteries which he was unable to resist?   None
of the subscribing witnesses were in any way interested in
the particular disposition he should make of his property.
The nurse who was excluded from the room had no interest
in it.   The mere fact that knowledge of the contents of the
will was confined to the subscribing witnesses is no evidence
that it was procured by undue influence.   *Vance v. Davis,*
118 Wis. 548, 95 N. W. 939, and cases there cited.   Seem-
ingly, there was no one near Mr. Moulton who could have
had any motive to influence him to make the will in question,
except *Mr. Gavitt.*   He was no stranger to Mr. Moulton.
They had known each other intimately ever since *Gavitt's*
marriage thirty years prior to the trial of this action. *Gavitt*
and his wife lived for many years in Berlin prior to 1886,
and in that year moved to Chicago.   Moulton had known Mrs.
Gavitt ever since she was a small girl.   While *Gavitt* lived in
Berlin, their places of business were opposite each other, and
Mr. Moulton would visit *Gavitt's* every day or evening.   After
*Gavitt* moved to Chicago, they kept up correspondence, and
at one time, and during the World's Fair, Moulton went to
Chicago and visited at *Gavitt's* for a week.   They had busi-
ness relations for twenty years.   Less than a month before he

died, Mr. Moulton wrote to *Mr. Gavitt* as his "Dear Cousin George," thanking him a thousand times for a letter received a few days before, and telling him about his feeble condition, and closing with these words: "Please inform me the time or about the time you will again visit our Berlin friends. With brotherly love to yourself and cousin Minnie [Mrs. Gavitt] I am respectfully your cousin, H. C. MOULTON." Friendly letters from Mr. Moulton to his nieces named in the will are also in evidence. *Mr. Gavitt* arrived in Berlin on the evening before the will was drawn, by reason of a long-distance telephone from a brother of the subscribing witness Wood, announcing that Mr. Moulton was sick and they would like to have him come up. There is nothing strange or unnatural in the fact of his going to Berlin at that time, and there is no evidence that he exerted or attempted to exert any influence over Mr. Moulton to induce him to make the will in question; much less any undue influence. This court has defined "undue influence in such a case" as "such an influence that the instrument is not properly an expression of the will of the testator in regard to the disposition of his property, but rather an expression of the will of another person" (*In re Jackman's Will,* 26 Wis. 104); and that "motives of natural affection and gratitude on the part of the testator," even when accompanied by "solicitations or arguments which appeal to such motives, do not constitute undue influence" (Id.; *Deck v. Deck,* 106 Wis. 472, 473, 82 N. W. 293).

"To establish undue influence sufficient to invalidate a will, it must be shown that the will of the testator was coerced into doing that which he did not desire to do." *Wingrove v. Wingrove,* L. R. 11 Prob. Div. 81.

So long as the will truly expresses the wishes of the testator, there is no ground for claiming that it was procured by undue influence. Here it appears from the undisputed evidence that the will did express the wishes of the testator at the time it was executed. Three days prior to that time he

had had an attack of apoplexy, and had been for a time un-
conscious.   He naturally realized the seriousness of his con-
dition and the necessity of preparing for the result likely to
follow.   His feelings towards the contestant—*Anna*—had
manifestly changed.   Affection, or even friendship, had been
superseded by hostility.   To whom would he naturally leave
his property under such circumstances?   There is certainly
nothing strange in the fact of his giving the bulk of his prop-
erty to his particular friends *Mr.* and Mrs. Gavitt, and the
balance to his nieces and nephew.   He lived nearly two years
after the execution of the will in question.   If the will had
in fact been procured by undue influence, then he would nat-
urally have changed or revoked the will after such influence
had been withdrawn or removed.   *Gavitt* did not remain in
Berlin after the execution of the will, but returned to his
home in Chicago.   If the will was not changed or revoked
during that time, then it may be fairly inferred that it did
truly express the wishes of Mr. Moulton when executed.   We
must hold that the finding of the court that the testator was
not under the undue influence of *Gavitt* or any other person
at the time the will was executed is sustained by the evidence.

3. The remaining question to be considered is whether the
will was revoked by the testator.   There is no pretense that
it was ever revoked by any other will, codicil, or writing exe-
cuted in the manner prescribed by statute.   Sec. 2290, Stats.
1898.   That section of the statute provides that a will may
be revoked "by burning, tearing, canceling or obliterating the
same, *with the intention* of revoking it, by the testator or by
some person in his presence and by his direction."   There is
no direct evidence that the will in question was ever burned,
torn, canceled, or obliterated at all, much less that any such
act was done to the will by the testator "with the *intention* of
revoking it," or by any "person in his presence and by his
direction."   Counsel for the contestant contend that where,
as here, it is established that the will was last known to be in

the possession of the testator, and could not be found upon his death, it raised a *prima facie* presumption that he destroyed it with the intention of revoking it, and that the burden of doing away with such presumption was upon the proponent. The proponent concedes such to be the law; and it undoubtedly is the law. "Upon this proposition the question is," as stated by counsel for the contestant, "Does the evidence of the proponent do away with this *prima facie* presumption?" The will was in the custody of the county judge from the time it was placed there for safe-keeping by the attorney who drew it, September 13, 1898, until it was withdrawn therefrom by the testator, August 14, 1899. During those eleven months there is no pretense that he revoked it, or attempted to revoke it, or desired to revoke it. During that time he was apparently satisfied with the disposition which the will made of his property. There is no evidence that any one but the testator had the custody of the will after it was so withdrawn from the county judge. The testator lived about eleven months after the will was so withdrawn. The substance of the ninth, tenth, eleventh, and twelfth findings of fact are given in the statement. It appears from them that the testator was careless in keeping his papers; that he remained unconscious for several days immediately before his death; that the contestant had access to his rooms and papers while he was so unconscious; that the papers were then in a scattered condition throughout his room; that immediately after his death the contestant removed part of such papers from his rooms, and refused to return them until compelled to do so; that not long before his death the testator declared to divers different persons that his will was executed as stated and was still his will; and the court further found as a fact that the will had been lost by accident, either by the testator just prior to his death, or had been destroyed by design or concealed by some other person soon after his death. The evidence seems to warrant such findings. True, the mere

fact that the contestant had an opportunity to destroy the will would not of itself overcome the presumption that it was destroyed by the testator with the intent to revoke it; still it is a circumstance to be considered with other proof. Thus it is stated by a standard text-writer that:

"If a will last traced to the testator's custody cannot be found at his death, the presumption that he destroyed it for the purpose of revocation outweighs the probability of its fraudulent and criminal destruction by another when unsupported by any evidence *except that of opportunity,* though this latter circumstance is always worthy of consideration with other proof." Schouler, Wills (2d ed.) § 402.

To the same effect, *Bauskett v. Keilt,* 22 S. C. 187; *Collyer v. Collyer,* 110 N. Y. 481, 18 N. E. 110.

Here there is much more than mere opportunity, as indicated by the facts stated. Besides, the evidence is ample to support the finding that the will was lost by accident. Whether it was lost by accident or destroyed by the design of others would be equally fatal to the contention of the contestant. The conduct and declarations of the testator show pretty clearly that he believed that he had possession of the will up to the time of his death. He showed the sealed envelope in which the will had been placed to his attorney in November or December, 1899. In the following January he missed the will, and on the 24th day of that month he made search for it, but was unable to find it. March 19, 1900, he told his attorney that he had lost his will, and that he would have to make another one just like it; and then stated the substance of the will, and that, if he did not find it, he was going to have it made over again the same way. In April or May he told his attorney that he had found his will, and showed him the sealed envelope in which it had been placed, and again showed it to him about the 1st of June. That such declarations of the testator were admissible on the question of the existence or nonexistence of such last will is abundantly supported by numerous adjudications. *Southworth v. Adams,*

11 Biss. 256, 260; *In re Steinke's Will,* 95 Wis. 121, 70 N. W. 61; *In re Valentine's Will,* 93 Wis. 45, 55, 67 N. W. 12, and cases there cited. In the first of these cases the testator, while stopping with a stepdaughter at Whitewater, made his will, and retained possession of it. He was an old man, and careless about his papers. He resolved to visit relatives in Brooklyn, N. Y., and so bought a ticket and checked his trunk for that place. At the depot in Whitewater, and just before starting, he stated that his will was in his trunk. When he got to Chicago, he suddenly died. His trunk went on, and was finally stopped in Buffalo, and when returned to Chicago it was found to be open. A large open envelope was found therein, marked as containing his will, but no will was found therein nor in the trunk. In a learned and able opinion of Judge Dyer, the will was established as a lost will. Among other things, he there said: '

"In this class of cases it was at one time somewhat questioned whether secondary evidence of the existence and contents of a will is admissible, and whether the declarations of the testator concerning the will may be shown to establish its contents and the probability or improbability of its destruction by him. It is now, however, fully settled both in England and in this country that such declarations are admissible, and that secondary evidence may be resorted to for the purpose stated."

The other cases cited are to the same effect. Such declarations showed an absence of any intention on the part of the testator to revoke his will. The presumption that he destroyed the will with such intent is fully overcome by the facts and circumstances in evidence. We find no reason for disturbing the judgment.

*By the Court.*—The judgment of the circuit court is affirmed.