## ESTATE OF JOHNSON.

*December 3, 1919—January 13, 1920.*

*Wills: Evidence as to signature and testamentary intent: Residuary legatee as competent witness: Testimony of bystanders: Declarations of testator subsequent to making his will: Proof of contents of lost will: Public policy to effectuate wishes of testator: Question on appeal: Allowance of fees to handwriting experts.*

1. In proceedings for the probate of a will, the evidence is *held* to show that testator had signed the instrument, though there was a conflict in the expert testimony on handwriting, there being eye-witnesses to the act of signing, and also to show that he had signed the instrument with testamentary intent and not as a joke or without serious intention.
2. Under secs. 2284, 4068, Stats., as they stood in 1895, a residuary legatee was a competent subscribing witness to a will, the common-law disqualification being wiped out and sec. 4069 not being applicable to the act of witnessing a will.
3. It is public policy to effectuate, where possible, the wishes of a testator.
4. Testimony of bystanders at the time of signing the will, though not subscribing witnesses, was properly received on the issue as to the genuineness of testator's signature, they having testified to having seen the instrument so signed by him.
5. On appeal from a judgment admitting a will to probate, contested for lack of genuineness of testator's signature, the only question at issue is whether or not the instrument propounded as a will should be admitted to probate.
6. Post-testamentary declarations of testator to the effect that he had made a will and for the benefit of proponent were admissible in proceedings to probate the will.
7. Such declarations are also admissible to prove the existence or contents of a will alleged to be lost.
8. In the absence of statutory authority the probate court improperly allowed fees for services and expenses of proponent's handwriting expert to be paid out of the estate, particularly in view of sec. 4041b, Stats., expressly justifying the allowance from the estate of proponent's counsel fees.

APPEAL from a judgment and two orders of the circuit court for Racine county: E. B. BELDEN, Circuit Judge. *Affirmed as to the judgment and one order; reversed as to the other order.*

This appeal is from two orders subsequent to and from a judgment of the trial court reversing a judgment of the county court of Racine county. The county court refused and the circuit court granted probate of the following writing alleged to be the last will and testament of one *Theodore W. Johnson,* deceased:

"September 6th, 1895.

"This is the will of Theodore W. Johnson. *Mrs. L. C. Hahn* is to take entire charge of all moneys or anything I leave or have. But first she is to see that all my debts are paid. Then he wants Katie Marten to have $500 for being so good to him. After this Nellie Newport is to get $200. After this Mrs. Cane next door is to get $200. To Mr. J. Wilson $200, then to Mr. C. P. Hanson $87 and what interest the law allows. Then to *Mrs. L. C. Hahn* for kindness to me and after attending faithfully to my wishes I leave to her all moneys there is left or whatever else belonged to me.

"William J. Hahn.          THEODORE W. JOHNSON.
 "L. C. Hahn."

And on the page opposite thereto, in *Mrs. L. C. Hahn's* handwriting, as was the body of the instrument itself, was the following: "And I am to see that his grave is kept green—not Irish. And to little Goldie Locks, she is to have $5 worth of chocolates."

All this was done with an indelible leadpencil in a small account book of about eight by three and one-half inches in size.

Johnson died at Racine March 3, 1917, unmarried, and then about sixty-four years of age. Shortly thereafter the public administrator of Racine county, *John D. Rowlands,* contestant and appellant herein, was granted administration of the estate. A search disclosed assets aggregating at the time of the hearing in the court below about $83,000, all in personal property, except one small piece of real estate appraised at about $2,500.

Johnson came from Denmark to this country at the age of about eighteen and lived in Racine substantially all the time thereafter. He was eccentric in his ways, penurious,

and very secretive as to his personal matters and family affairs. He originally was a shoemaker, then ran a small shoe store, and after a few years traded that for a small farm, and thereafter devoted his time to the purchase and sale of real estate and securities. In the last years of his life he occupied for living quarters a small room in the upper story of an old store building. He was removed to the local hospital a few days before his death, leaving in his unlocked room a satchel unlocked in which were found the promissory notes and land contracts constituting his estate. The mortgages securing the payment of such notes were found in an unlocked trunk in a small room in the rear of the one building that he owned. There were in force at his death upwards of fifty mortgages and contracts mostly in his handwriting. No letters or papers were found among his effects purporting to be from or concerning any relatives. He carried one or more bank accounts for many years prior to his death.

The proponent, *Mrs. L. C. Hahn,* in 1895 and some time prior thereto, had been conducting a millinery shop on Main street in Racine. Mr. Johnson at that time was living near there and taking his meals at the house of a Mrs. Cane, one of the beneficiaries named in the instrument. He was quite a frequent visitor at *Mrs. Hahn's* place of business. For some time prior to September, 1895, he suffered from boils, carbuncles, and running sores which needed frequent attention. Help in giving such attention and dressing the sores had been given by *Mrs. Hahn* as well as by Miss Katie Marten and Miss Nellie Newport, both employees of *Mrs. Hahn,* and also mentioned in said instrument. The circumstances surrounding the alleged signing are related by the subscribing witness William J. Hahn and quoted by appellants in their brief. After telling of the witness's arrival at *Mrs. Hahn's* store and of the deceased speaking to him, he proceeds as follows:

"Laying his hand on Kitty Marten's shoulder he [John-

son] says: 'This girl has just saved my life.' And I said, 'In what way?' He says: 'Why, she has been doing for me all the time, and taking care of me.' I said: 'Well, if she has, why don't you do something for her? Why don't you leave her something; do something for her,' and, as the phrase was, I remember saying: 'Leave her your old shoes.' And in return he said, 'Well, I will.' He says: 'I will make my will right now,' he says, 'if *Mrs. Hahn* will write it.' Of course we all looked up surprised, and *Mrs. Hahn* said: 'All right.' She turned to her little cash book—we were all standing around the desk—and she wrote as he dictated, just as is written in that book. Then after it was all written he took it, read it over, and he signed it; then handed the book to me, and he said: 'Mr. Hahn, you sign that.' I says: 'All right.' And he asked *Mrs. Hahn* to sign it; and that is all that was said at the time, that I remember."

The same witness further testified in substance:

"I used the pencil attached to the book, and Johnson and *Mrs. Hahn* used the same pencil, and it was all done at that desk. *Mrs. Hahn* signed next. I saw her sign. It took about thirty minutes to three quarters of an hour for Johnson to dictate and *Mrs. Hahn* to transcribe the instrument. I don't know as there was any talk going on at the time. Johnson would dictate and stop and think and go on with the dictation and *Mrs. Hahn* would write until it was finished. *Mrs. Hahn* at one place stopped and asked him if there was not somebody else he wanted to leave something to, and he said no, that he had no relatives. Mr. Johnson said nothing about what the kindness consisted of in connection with the legacy to *Mrs. Hahn.* Everybody knew what he meant. After the document was signed by we three, nothing more was said; then we had a general conversation."

There was testimony to the effect that Johnson signed the instrument while he was standing at the end of a desk, the top of which slanted downward from him, the lower end about thirty inches from the ground; by artificial light; with a short indelible pencil; in a leaning position, and while still afflicted with boils on his neck and a running sore on

his leg (it being claimed that some or all of these things, particularly the condition of his neck, made him take a somewhat strained and unnatural attitude while writing his name).

There were also present at this time, according to the testimony, in addition to the two who signed as subscribing witnesses, the little child of *Mrs. Hahn,* referred to as Goldie Locks, the husband of the mentioned Mrs. Cane, who died prior to the trial, a Mrs. E. C. Thellar, a sister-in-law of *Mrs. Hahn* and then visiting from New York, the Miss Katie Marten mentioned in the will, and Marshall Forest, a friend of the Hahn family then living in the neighborhood. Forest subsequently moved to Arkansas, and, upon seeing in the Racine paper an account of the death of Mr. Johnson, caused a letter of congratulation to be sent to *Mrs. Hahn* on her being interested in the estate. The depositions of Forest and Mrs. Thellar were taken on behalf of the proponent.

The testimony disclosed that the account book in which the writing appears had been kept before and for several years after 1895 in *Mrs. Hahn's* store in connection with her business. *Mrs. Hahn* testifies that in 1900 she moved to New York and this note book was placed in a small paper box with some small articles belonging to her child and carried with them in a trunk to New York and brought back with the family on their return to Racine and stored in their home. After hearing of Mr. Johnson's death, she claims to have made a long search for it and finally discovered it still in the box within the same trunk. Immediately upon its being found she presented it for probate on April 10, 1917.

Upon the petition for the probate of said instrument as the will of Johnson, objections were interposed on behalf of *Mr. Rowlands* as administrator, and also on behalf of *Lars Hansen Christiansen* of Council Bluffs, Iowa, claiming to be a cousin and heir at law, and by the Danish consul

at Chicago on behalf of persons claiming to be foreign heirs, and all appellants herein.

Upon the first hearing testimony was offered by the contestants, including that of an expert on handwriting, to the effect that the signature purporting to be that of Theodore W. Johnson to the instrument was spurious, and the county court so held and for that reason denied probate. Upon appeal, trial was had in the circuit court for Racine county before a jury.

The proponent, *Mrs. Hahn,* was permitted to testify both in the county court and circuit court, over objections interposed by the contestants as to her competency to so testify as to the writing of the instrument, as to the facts and circumstances connected with the signing of the same and as to her acquaintance with the deceased.

The trial court submitted to the jury an advisory verdict of but one question of fact, which was answered to the effect that the signature of 'Theodore W. Johnson affixed to the writing in question was the genuine signature of Theodore W. Johnson.

The contestants moved to set aside the answer of the jury and for a judgment affirming the judgment of the county court and denying the will to probate. The court, upon such advisory verdict and upon the testimony, made findings of fact and conclusions of law in effect determining that the signature was genuine; that the will was properly executed; that *Mrs. Hahn* was a competent attesting witness to the same; and that said Marshall Forest and Mrs. E. C. Thellar were witnesses to the transaction; that the instrument should be allowed and probate thereof granted as the last will and testament of said Theodore W. Johnson, deceased; and that the order and judgment of the county court be reversed and the matter remanded to the county court for further proceedings according to law.

Subsequently, upon application on behalf of the proponent, the circuit court directed the allowance and pay-

ment out of the body of said estate of the sum of $382.86 for the services and expenses of a witness from Chicago, Illinois, called by the proponent as an expert on handwriting; and made a further order directing the payment in the same way of $475 to Mr. John B. Simmons, and a further sum of $645 to Mr. Wallace Ingalls, as counsel fees for services rendered by them on behalf of the proponent in said contest.

The contestants excepted to a refusal of the trial court to submit, on their request, an additional question for the determination of the jury worded as follows:

"(2) If your answer to question No. 1 is 'Yes,' then was it the intention of said Theodore W. Johnson, at the time of signing said writing, that the same should constitute and be his last will and testament?"

They also excepted to certain portions of the charge given by the court, to certain findings of fact, to the conclusions of law, and also to the refusal of the court to set aside the verdict of the jury and grant a new trial. They have appealed to this court from the judgment directing probate of the will and from the two several orders of allowance of fees to the expert witness and attorneys.

For the appellants there was a brief by *Thompson, Myers & Kearney* and *Hand & Quinn,* all of Racine, and *McCulloch & McCulloch* of Chicago, attorneys, and *Thomas M. Kearney, Jr.,* and *Elbert B. Hand,* both of Racine, and *Bertram W. Rosenstone* of Chicago, of counsel; and the cause was argued orally by *W. D. Thompson* and *Thomas M. Kearney, Jr.*

For the respondent there was a brief by *Wallace Ingalls,* attorney, and *Simmons & Walker,* of counsel, all of Racine, and oral argument by *Mr. John B. Simmons* and *Mr. Ingalls.*

ESCHWEILER, J.    The contestants below, appellants here, raise two questions of fact: Was the signature of Theodore W. Johnson on the instrument in question genuine? and

Then, if so, was the instrument signed by him with the in-
tention of making his will?

On the first question, in addition to William J. Hahn and
the proponent, *Mrs. L. C. Hahn,* who testified as subscrib-
ing witnesses, Mr. Marshall Forest and Mrs. Etta C.
Thellar testified directly to the signing of this instrument by
the deceased at the time. Mrs. Katherine Kempel, who was
the Katie Marten mentioned in the instrument, testified to
having been present at the time of the alleged transaction
and to having seen the writing in this book again on the
following morning and to having called the attention of
another of the then employees of *Mrs. Hahn,* a Mrs. Anna
Becker, to it. The latter also testified to having seen the
instrument on the following morning. Mr. Fred Hoernel,
who at the time was employed in a hardware store one
block east of *Mrs. Hahn's,* and a frequent visitor, testified
to having had the book and the writing shown to him the
next day by *Mrs. Hahn.*

A large number of checks, contracts, receipts, and re-
leases in the register of deeds' office, all shown to have the
genuine signatures of the deceased, were before the jury
for their consideration and comparison with the signature
in question and furnished plentiful ammunition for the
very interesting, at least, battle of the handwriting experts.

Reproductions and enlargements of the signature in-
volved and the concededly genuine ones were received in
evidence. There is printed herewith the following:

No. 1, a portion of the instrument which was presented
for probate with the questioned signature of Theodore W.
Johnson and the signatures of Mr. and *Mrs. Hahn.*

Nos. 2, 3, 4, and 5 were signatures of Johnson on con-
veyances or instruments executed by deceased at the respec-
tive dates of August 1893, April 1894, March 1894, and
No. 5 on September 10, 1895, being within four days of the
date of the alleged will and described by contestants' ex-
pert as being a standard example of his then signature.

Some question was raised as to the possible difference in

the signature of an individual when using pen and ink or when writing with a leadpencil as in this case. No. 6 is a photograph of the leadpencil signature to a receipt given by Mr. Johnson in September, 1915.

Nos. 7 to 12 inclusive are further specimens of his signatures written at various times in 1894 and 1915 and also used for comparison.

Nos. 13, 14, and 15, respectively, were signatures on checks made in August 1899, April 1912, and January 1916, illustrative of his special form of signature to checks, and it is conceded that there was little change, if any, in the form of such signature during all those years.

From their study of the challenged signature above reproduced and of the above given and concededly genuine signatures of Johnson, as well as of the many others in the record, the handwriting experts on behalf of the contestants were positive in their conclusion that the document in question was not signed by Johnson. They base such conclusion upon the following among other things: the difference in the slant and form of the small $e$ (being in the genuine signatures a vertical or Greek $e$); the form of the $n$, with rounding rather than sharp tops; in the spacing and connection of letters; in their slant; in the use of a round instead of an angular finish; then also the peculiar formation of the $W$ and of the $T$; that the $T$ was made with two up-strokes instead of a down-stroke as in the genuine signatures; the combination of the $T$ and the $h$ and of the $h$ and $e$; again, in that the alignment and height of the letters is irregular and not like the genuine; that there are patches or amendments to several of the letters, particularly in the $h$ in Johnson, indicating a manufactured signature; that the general picture of the questioned signature is not that of his genuine signature of that period.

The proponent's expert, on the other hand, arrived at his positive conclusion that the questioned signature was genuine from his study of the same signatures and for his

"I leave to her all money [?]
there is left or whatever
else has belonged to
me
Theodore H. Johnson

Theodore W. Johnson

Theodore W. Johnson

T. W. Johnson

Theodore W. Johnson

Theodore W. Johnson

Theodore W. Johnson

Theodore W. Johnson

Theodore W. Johnson

Theodore W. Johnson

Theodore W. Johnson

Theodore W. Johnson

W. Johnson

W. Johnson

W. Johnson

stated reasons, that while there was no admittedly genuine signature produced that could fairly be said to be the same in all particulars with that which appeared on the document here and that there was a pictorial dissimilarity between this and the genuine, yet there were such marked similarities and unconscious peculiarities to be found in both the questioned signature and the genuine ones as to warrant his conclusion. Among such reasons were, that he found a marked similarity in the slant of the letters; a peculiar irregular spacing between the letter *o* and the letters following it in both the first and last name; the formation of the *T;* the wider space between the initial *W* and the following name than there was between the same initial and the preceding name; an apparent difficulty in writing the *W;* the variant forms of the *J* used by the deceased; the evident change as time went on in such forms of that letter as well as of his *W's*. This expert says that the initial *T* was made with two downward strokes rather than with two upward ones as testified to on the other side. He sees also a patching of the small *h* as well as of the *s,* but neither indicates to him anything pointing to a forgery.

With the situation thus disclosed and upon all the evidence, we fully agree with the trial court in his opinion on this point wherein he says:

"I entertain no doubt that without the verdict of the jury the result would have been the same, because I think the positive testimony of witnesses whose integrity and credibility is otherwise unassailed is not outweighed or overcome by the testimony of handwriting experts who express opinions only. The testimony of honest witnesses who state that they know what they testify to is more convincing than theory. It is not likely that the testimony of the several witnesses who testify that they were present and know what took place would make up such a story. I do not positively know whether Johnson signed the writing in question; the handwriting experts do not know; but several witnesses testify that they do know and that he did sign it, and I have no hesitancy in concluding upon the competent

evidence in that behalf that he did and that it is the duty of the court to so find. It is not incumbent upon the proponent to establish beyond all doubt that Johnson signed this writing, but only to produce a preponderance of evidence in that behalf, evidence of greater convincing power than that produced by the contestants on the proposition involved, and I am satisfied this burden has been amply met."

We therefore see no grounds for reversing that conclusion.

On the second issue of fact contestants contend that the trial court should either have submitted question No. 2 proposed by them and quoted above, or should have found that if the deceased did sign the instrument it was not done with the intention of making it his will, but that it was rather in the nature of a joke or with no serious intention of taking so solemn a step as providing for the disposition of his property after his death.

According to the testimony of those claiming to have been present at the time after the body of the instrument had been finished and signed, then some jocular conversation took place between the parties, resulting in the writing being added by *Mrs. Hahn* on the opposite page as it is quoted above. We do not deem this subsequent incident of much significance.

Stress is laid by contestants upon what is claimed to be the unlikelihood of Johnson making such a disposition of his property as indicated in the instrument. It is true that there was no close friendship between the family of *Mrs. Hahn* and Mr. Johnson at any time, but apparently there was none such between the deceased and any one else. His was a solitary life by preference. Apparently he had cut himself off from all his relatives. He was without home ties then and during the rest of his life. He had been befriended and assisted by *Mrs. Hahn* and those associated with her in services of an unpleasant nature and rendered to him apparently without expectation of reward. So far as it now appears from the testimony, no one then believed

that what was being disposed of by the residuary clause would amount to any substantial sum. Certainly none then anticipated that whatever small amount of property the man possessed would, through what must have been his painful and persevering accretions, grow to the substantial amount now involved. Whatever it then was, it was his to dispose of as he saw fit, and nothing is shown of any subsequent desire to do otherwise. *Deck v. Deck,* 106 Wis. 470, 473, 82 N. W. 293. Its being left with *Mrs. Hahn* was certainly not inconsistent with a desire that she should benefit from it. He was not overcareful, to say the least, with his own papers, as shown by their condition at the time of his death. He did not need its possession in order to lawfully revoke, nor is there any ground for suspecting that it would not have been surrendered to him upon demand.

There is nothing in the record that would warrant us in saying that the instrument was not in effect what its plain and simple language purports to be. The conclusion of the trial court on this question of fact also cannot be disturbed.

Contestants present several questions of law for consideration.

First, that the instrument offered for probate was not attested and subscribed by two or more competent witnesses in accordance with the then provisions of sec. 2282, Stats., in that *Mrs. Hahn,* being designated therein a beneficiary, was not a *competent* witness thereto, thus leaving but one competent witness, viz. William J. Hahn.

Second, that though sec. 2284, Stats., then made any gift to a subscribing witness to such a will void, it did not make her thereby a competent witness.

Third, that *Mrs. Hahn* as a legatee has such an interest thereunder that she is further prohibited from testifying as to its execution by reason of sec. 4069.

Fourth, that under sec. 2282 a will cannot be proven by other than competent subscribing witnesses, and therefore

the testimony of Mrs. Thellar and Mr. Forest, not subscribing witnesses but present at the time, ought not to have been received or considered in determining the question as to whether or not the will had. been executed.

Fifth, that the court erred in admitting testimony of alleged declarations and statements of Johnson subsequent to September, 1895, to the effect that he had made his will and for the benefit of the proponent.

Sixth, that there is no warrant for the allowance made for the services and expenses of the expert witness called by proponent.

It is freely conceded by both sides that the questions now before us are to be determined under the statutes as they stood and the law as it was in September, 1895, the time it is claimed the will was executed.

Sec. 2282 then read as follows:

"No will made within this state, except such nuncupative wills as are mentioned in this chapter, shall be effectual to pass any estate, whether real or personal, nor to charge or in any way affect the same, unless it be in writing and signed by the testator, or by some person in his presence, and by his express direction, and attested and subscribed in the presence of the testator by two or more competent witnesses; and if the witnesses are competent at the time of attesting the execution of the will, their subsequent incompetency, from whatever cause it may arise, shall not prevent the probate and allowance of the will, if it be otherwise satisfactorily proved."

Sec. 2284 read:

"All beneficial devises, legacies and gifts whatsoever, made or given in any will to a subscribing witness thereto, shall be wholly void, unless there be two other competent subscribing witnesses to the same; but a mere charge on the lands of the devisor, for the payment of debts, shall not prevent his creditors from being competent witnesses to his will."

Sec. 4069, so far as material here, read:

"No party, and no person from, through or under whom a party derives his interest or title, shall be examined as a

witness in respect to any transaction or communication by him personally with a deceased ,person, . . . in any civil action or proceeding in which the opposite party derives his title, or sustains his liability, to the cause of action from, through or under such deceased person . . . unless, . . ."

Sec. 4068 then read:

"No person shall be disqualified as a witness in any action or proceeding, civil or criminal, by reason of his interest in the event of the same, as a party or otherwise; and every party shall be in every such case a competent witness, except as otherwise provided in this chapter.   But such interest or connection may be shown to affect the credibility of . the witness."

In the Territorial Statutes of 1839 complete provisions were made both as to the required manner of the execution and of the proof of wills.  One such (§ 25, p. 182), providing in substance the same as sec. 2284, *supra,* ended with these words: "and such person shall be admitted as a witness to the execution of such will or codicil, such devise, legacy, estate, interest, gift or appointment notwithstanding."

By the revision of 1849 this subject matter was rewritten into substantially the present form of secs. 2282 and 2284, *supra,* with the kindred statutes now found in ch. 103 of the Statutes, relating to wills, including sec. 2285, which saves to a subscribing witness, who in case of intestacy would take a share in the estate, such proportion of such share as would not exceed the specified provision of the will.   In such revision, however, the words last quoted from the then sec. 25 were dropped out and no similar express provision subsequently appears in the Statutes.

From such omission contestants argue that the legislature thereby indicated an intention to revoke the former competency of such interested subscribing witness and to thereby reinstate the common-law rule that any one, either a party or witness, having a direct pecuniary interest in the event of the particular litigation was incompetent to testify therein.

The well established rule of the common law which disqualified such interested persons, either parties or witnesses, was strictly adhered to in this state except as modified by statute. *Smith v. Swarthout,* 15 Wis. 550, 552. Provisions had been made, however, from early days that an adverse party might be examined as a witness before trial or upon the trial on prior notice to that effect, either of which events qualified the other party to be examined on his own behalf, and also that a party might in certain cases be examined on his own behalf upon giving notice of intention so to do, and further provisions lifted the disqualification as to persons interested in certain public and other corporations.

That this common-law rule was firmly intrenched in this state is evidenced by the slow process by which it was removed.

The general lifting of this disqualification as to witnesses began by sec. 300, ch. 120, Laws 1856, providing: "No person offered as a witness shall be excluded by reason of his interest in the event of the action," but the following section thereto provided that such sec. 300 should not apply to *a party* to the action nor to any person for whose immediate benefit it is prosecuted or defended.

It was extended generally as to parties by sec. 50, ch. 137, R. S. 1858, wherein it was provided, "No person shall be disqualified . . . by reason of his interest in the event of the same *as a party or otherwise,* except in cases," etc.

Up to this time such relieving statutes had not been made applicable to criminal proceedings. By ch. 274, Laws 1861, the defendant in a criminal action for assault and battery was given the right to be examined as a witness in his own behalf where the assaulted person was a witness for the prosecution, and by ch. 72, Laws 1869, first appeared what is now in substance sec. 4071, Stats., permitting the accused, at his own request, in all criminal actions and proceedings to be a competent witness. This broadening of the relieving statutes to criminal as well as civil proceed-

ings seems first to have been carried into the general stat-
ute, what is now sec. 4068, by the revision of 1878, evi-
dently to make it harmonize with the change of the law
in 1869.

Giving due weight to any possible significance from the
dropping of the phrase above quoted from the chapter on
Wills of 1839 and the firmness with which the common-law
rule was upheld in our practice, we are nevertheless con-
strained to hold that sec. 2284 as it stood in 1895 made
*Mrs. Hahn* a competent subscribing witness, and that any
common-law disqualification on the ground of her interest
in the event of the litigation was wiped out by sec. 4068,
*supra.*

To hold that sec. 2284, *supra,* merely made the gift void
and left the witness still incompetent would make such
statute an idle ceremony, for as against the loss to the
designated beneficiary there would be no resulting benefit
to any one else nor any promotion of the public policy so
often declared of effectuating, where possible, the expressed
wishes of a testator. *Will of Dardis,* 135 Wis. 457, 115
N. W. 332; *Will of Rice,* 150 Wis. 401, 136 N. W. 956,
137 N. W. 778; *Estate of Staab,* 166 Wis. 587, 166 N. W.
326.

Having reached this conclusion as to the effect to be
given to sec. 2284, we cannot well avoid the further step
that she is not excluded from so testifying by the provisions
of sec. 4069, *supra,* as it is urged she is by contestants' third
point above stated.

It has been held in former decisions that this particular
statute does apply generally to the testimony of persons in-
terested in the estate, the subject of the litigation in probate
proceedings. *Goerke v. Goerke,* 80 Wis. 516, 519, 50 N. W.
345; *Valentine's Will,* 93 Wis. 45, 51, 67 N. W. 12; *Will
of Pullen,* 166 Wis. 254, 258, 165 N. W. 25.

It is suggested *arguendo* only in *Goerke v. Goerke,* 80
Wis. 516, 520, 50 N. W. 345, that it might apply to the

testimony of subscribing witnesses to a will, but the point here involved has not been directly before the court in any former decision. Now being required to dispose of it, we are of the view that sec. 4069 does not apply to the particular form of such a transaction as is involved in the attesting of a will by becoming a subscribing witness thereto, and for the reason that such an act, if it be a transaction with the deceased, is nevertheless saved from the effect of that section by being the subject of particular and special consideration by secs. 2282 and 2284, *supra,* in the separate chapter on Wills. The same result was reached in the case of *Knutson's Estate* (Minn.) 174 N. W. 617, and *Hudson v. Flood,* 28 Del. 450, 94 Atl. 760, where a full discussion is found. To the same effect, also, *Wilson's Will,* 103 N. Y. 374, 8 N. E. 731; *Loder v. Whelpley,* 111 N. Y. 239, 245, 18 N. E. 874; *In re Kindberg,* 207 N. Y. 220, 226, 100 N. E. 789; *Brown v. Carroll,* 36 Ga. 568; *Henry v. Hall,* 106 Ala. 84, 101, 17 South. 187; *Vester v. Collins,* 101 N. C. 114, 7 S. E. 687.

Much reliance was placed by appellants upon the cases from Massachusetts, particularly *Crowell v. Tuttle,* 218 Mass. 445, 105 N. E. 980, that case holding that a designated beneficiary in such an instrument was not a competent and credible witness to the same. Such decisions, however, are not controlling here in view of the substantial difference under the Massachusetts law from that here, namely, that under the relieving statute of Massachusetts, similar to our sec. 4068, *supra,* it is expressly provided that such statute "shall not apply to the attesting witness to a will or a codicil." See secs. 13 and 15, ch. 131, Gen. Stats. Mass. 1860, and secs. 20 and 23, ch. 175, Rev. Laws Mass. 1902.

Having held that *Mrs. Hahn* was a competent subscribing witness, the objection urged under the fourth point to the admission of the testimony of Mrs. Thellar and Mr. Forest as to the execution of the will becomes immaterial.

Their testimony in any event was properly received on the issue being raised as to the genuineness of the signature of the deceased to the instrument in question, they having testified to having seen it so signed.

Upon the appeal from the judgment in this case the one question at issue and before us is as to whether or not the instrument propounded as a will should be admitted to probate. *Farmer v. Sprague,* 57 Wis. 324, 15 N. W. 382; *Will of Battis,* 143 Wis. 234, 126 N. W. 9. Whether *Mrs. Hahn,* being now held to be a competent subscribing witness, shall or shall not take under the will now admitted, or what effect, if any, the amendment to sec. 2284 which has been made since 1895 in striking out the word "subscribing" as it appears between the words "competent" and "witness," may have, is not necessarily or properly before us and we express no opinion thereon. Both sides in this litigation have expressly refrained from taking positions that might be subsequently embarrassing for manifestly cogent reasons, and we are satisfied to so leave the question. "Sufficient unto the day is the evil thereof."

The objection under the fifth point stated to the admission of post-testamentary declarations of deceased to the effect that he had made a will and for the benefit of the proponent cannot be sustained.

It is well established that subsequent declarations of a testator are admissible to prove the existence or contents of a will alleged to be lost. Cassoday, Wills, §§ 314, 325; *Valentine's Will,* 93 Wis. 45, 53, 67 N. W. 12; *Steinke's Will,* 95 Wis. 121, 126, 70 N. W. 61; *Gavitt v. Moulton,* 119 Wis. 35, 51, 96 N. W. 395; *Jones v. Roberts,* 96 Wis. 427, 433, 70 N. W. 685, 71 N. W. 883; *Aldrich v. Aldrich,* 215 Mass. 164, 170, 102 N. E. 487.

Being admissible on such issue, we see no reason why they are not equally admissible on the question here raised as to whether the propounded instrument was the genuine will of deceased.

We think the objection is well taken under the sixth point, to the allowance to be paid out of the body of the estate of fees for services and expenses of proponent's handwriting expert. Power to award costs in probate proceedings is entirely statutory. *Donges's Estate,* 103 Wis. 497, 513, 79 N. W. 786; 40 Cyc. 1362; *Sears v. Nahant,* 215 Mass. 234, 238, 102 N. E. 491.

No statute has been called to our attention, nor can we find any, that warrants the allowance of such an item. That the allowance out of the estate of proponent's counsel fees is based upon the legislative authority under sec. 4041*b* is quite a strong indication of the need of similar legislative authority for the allowance of such items as here in question.

The order admitting the instrument to probate being now upheld, the allowance to counsel for proponent was properly made.

*By the Court.*—The judgment of the circuit court granting probate of the instrument as the last will and testament of Theodore W. Johnson and the order allowing counsel fees are each affirmed. The order allowing compensation to proponent's witness is reversed; proponent to have her costs in this court.