Will of Knierim: Knierim (Andrew) and another, Respondents, vs. Knierim (Charles), Appellant.

*January 10—February 8, 1955.*

598

For the appellant there were briefs by *Gold & McCann* of Milwaukee, and oral argument by *William R. Gold.*

For the respondents there was a brief and oral argument by *Lester H. Gunsburg* of Milwaukee.

FAIRCHILD, C. J.    An instrument propounded as the last will and testament of William Knierim, deceased, was admitted to probate over objection of Charles G. Knierim, a grandnephew of the deceased.

There is in the record a complete description of testator's age, manner of living, conduct of business, showing him to have been an independent character attending to his business, collecting his rents, managing his properties and affairs, until November 3, 1952, when he sustained an injury. Fol-

lowing the injury he was physically unable to attend personally to his business. He gave a power of attorney to one of his tenants who was an attorney at law, sufficiently referred to in the findings of fact. There is competent evidence in the record that with a very apparent reason he became dissatisfied with the conduct of those who assumed the duties of taking over the management of his estate, and that he effectually took his affairs out of those hands. All this was before the formulation and execution of the will. Because there is ample evidence to sustain the findings of fact, we will not enter upon an extensive review of the testimony but will confine our observations particularly to events occurring between February 27, 1953, and March 3, 1953, the time the will was executed. We appreciate the court below had before it testimony which bears upon the condition of the testator from his injury to his death. However, it is apparent that the ultimate decision must be based on the testator's mental condition and independence on March 3, 1953. There were, following his injury, instances of disorientation and confusion, but nothing of that nature was present at the time between February 27th and March 3d, within which period we are now directly concerned.

In *Will of Silverthorn,* 68 Wis. 372, 32 N. W. 287, where the testator experienced intervals when his mind was reasonably clear, and during such an interval he gave directions for drawing his will and executed it, and its provisions were simple and reasonable, it was held that he had sufficient testamentary capacity to make a valid will. See also *Gavitt v. Moulton,* 119 Wis. 35, 96 N. W. 395; *Will of Bowman,* 133 Wis. 494, 113 N. W. 956; *Will of Mullan,* 140 Wis. 291, 122 N. W. 723; and *Boardman v. Lorentzen,* 155 Wis. 566, 145 N. W. 750.

"Undue influence 'cannot be presumed from conjecture or suspicion without reasonable and satisfactory proof of facts establishing the contrivance and undue influence.'" *Will of*

*Wallace,* 197 Wis. 323, 326, 222 N. W. 255. In *Will of Schaefer,* 207 Wis. 404, 411, 241 N. W. 382, it is said, "In this state undue influence is considered as a species of fraud and must be established by clear, convincing, and satisfactory evidence." (Citing cases.)

The will was drafted by Mr. Harvey Habeck, "a reputable attorney of long standing." He testified that "the will was executed according to law; that testator was of full age and of sound mind and memory and under no restraint at the time the will was executed. He further testified that he was with testator between fifty minutes and an hour at the time he executed the will, and that no one else was in the room except the testator and the witnesses."

The accompanying witness, Donald S. Henningfeld, an engineer by profession, who holds the position of chief engineer of Northern Light Company in Milwaukee, testified that "the will was signed in testator's room at the Capitol Hospital, Milwaukee, Wis., on March 3, 1953; that testator declared it to be his will, signed it in his presence and in the presence of Mr. Harvey R. Habeck, the other attesting witness, and that he and Mr. Habeck signed as witnesses at the request of the testator and in his presence and in the presence of each other; that testator was of sound mind and of full age at the time he executed the will and under no restraint or undue influence or coercion; that the witnesses were in the room with testator for about an hour while the will was being drawn; that he carried on a general conversation with testator as to his place of residence, state of the weather, his past existence, where he had lived up to that time, terms he wanted in his will; that he had observed nothing irrational or abnormal about him; that Mr. Habeck asked testator if he wanted to see him and he said he did and Mr. Habeck asked him 'What do you want to see me about?' and he said that 'he wanted Andrew and Shirley to get everything;' that Mr. Habeck asked testator if he wanted him to write a will

for him and he said he did. He stated that he wanted Andrew and Shirley to share his estate, to get everything and that Mr. Habeck asked him if he wanted to make any other gifts and he said he wanted Carl to get $500 and his mother $500 and $100 to St. Stephen's church; that testator also inquired about the money that [his attorney in fact] had. Testator also advised Mr. Habeck that he wanted Andrew and Shirley to handle his estate; that Mr. Habeck repeated the statements of testator as he wrote them down and when he was through taking notes he read them to testator and asked him if these facts were correct. That when testator asked about the money [his former attorney in fact] had Mr. Habeck advised him that they had not yet gotten it; that the proceedings had not been completed. Mr. Habeck and testator discussed the South side of many years back and testator stated that he remembered when National avenue was called Mukwonago road. Mr. Habeck read the will to testator and asked him if it was correct and if he wanted to sign it and he said he did and he asked for a pen. Mr Habeck gave him his pen and he signed it, signed the will and then he asked that we sign too."

Between the time of the injury and the drawing of the will, while in the hospital, there were times when the testator, under sedatives and recovering from their effect, would be properly described as disoriented. There were notes offered in evidence of decedent's condition made by Dr. John Usow, who was not called as a witness. On the other hand, there is testimony by Clara Alt, a nurses aid at the hospital, stating that she knew the testator, saw him five or six days a week at different times, that he was mentally alert, nothing wrong with his speech, had a good memory; that she was on duty on March 3, 1953, from 3 p. m. to 11 p. m., that she could not see any change in him at any time. He was all right. And Walter Kussrow, a trained practical nurse and one of the owners of the Pleasant Convalescent Home, testified that he knew the testator from January to April, 1953; saw

him daily; his conversation was connected and he seemed to observe everything that was going on. There was testimony of a similar nature and effect by Sylvia Patyk, nurses aid at the Pleasant Convalescent Home, and by the Reverend Henry J. Eggold, who visited the deceased frequently at the convalescent home,—that at all times he appeared to be rational, that each visit was for about ten to fifteen minutes, usually in the afternoon between two and three o'clock. In the statement of facts, there is reference to the medical testimony of Dr. John L. Garvey and of Dr. Francis J. Millen, specialists in neurology and psychiatry. These witnesses came into the case when the proceedings with relation to the appointment of a guardian for the deceased was under consideration in the county court. Dr. Garvey examined the deceased on two occasions, March 14 and March 23, 1953, and he was of the opinion that on these occasions the deceased had testamentary capacity. Dr. Garvey spent approximately an hour with him, discussed affairs with him, his estate and interests; and the testator told him he had a niece and nephew here and some distant relatives on the west coast, told him that he had not married. Dr. Millen testified that he had examined testator on two occasions, March 14 and March 23, 1953, and on both occasions, in his opinion, testator was competent to make a will.

The appellant properly enough calls attention to the incidents during the period the attorney in fact interested himself, and that at times he was confused, "indicative of lapses of memory" and that his condition was "critical." However, those lapses were not constant, and his ability to rouse himself to have a full appreciation of the particulars of his business and affairs of life and "to hold them in mind for such a time as to perceive and understand their obvious relations and to form a rational judgment in relation to them," is held to sustain a finding that he had sufficient mental capacity to make a

will. *Will of Mullan, supra,* page 295. This clearly appears in the transactions and occurrences between February 27, 1953, and March 3, 1953, at which time this will was executed.

The evidence sustains the findings of due execution of the instrument and of mental competence of the testator, and that the will was not procured by undue influence. These findings are sustained by ample evidence and rule with respect to those points determining this appeal. Undue influence cannot be presumed. The learned county judge noted that although the testator was old, there was evidence showing him to be an independent and self-reliant character, in spite of the misfortune coming in his later years. He dismissed those who were interfering with his plans and turned to his nephew and niece. Of them the court said in his written decision: "The nephew, Andrew, and the niece, Shirley, visited the testator regularly from the date of his injury to the date of his death. They were kind and attentive to him which would appear to be a natural and proper thing for them to do. The testimony shows that testator had abundant reasons, following his accident, for leaving the bulk of his estate to them. The will is not unnatural under these circumstances. The nephew and niece were his nearest relatives. The objector herein was not close to testator and had not kept in contact with him and had seen him but twice in his lifetime, the last time being in 1933." The court stated the rule recognized universally, that " 'the control which the law still gives to a man over the disposal of his property is one of the most efficient means which he has in protracted life to command the attention due to his infirmities. The will of such an aged man ought to be regarded with great tenderness, when it appears not to have been procured by fraudulent acts, but contains those very dispositions which the circumstances of his situation, and the course of his natural affections dictated.' " Thompson, Wills (2d ed.), p. 89, sec. 62; *Will of Boardman,*

178 Wis. 517, 190 N. W. 355; *Estate of Wegner,* 185 Wis. 407, 201 N. W. 826; *Will of Schaefer, supra.*

It is considered that the court properly concluded that the will of William Knierim, executed March 3, 1953, was executed in the manner provided by law, and that on that date testator had sufficient mental capacity to execute a will, and that the will so executed by him was not the result of undue influence practiced upon him by Andrew Knierim or Shirley Knierim Tate, or by any other person.

*By the Court.*—Judgment affirmed.