### FLYNN v. VANDERSLICE'S ESTATE.

No. 18660—Opinion Filed Dec. 11, 1928.

Bowling & Farmer, for plaintiff in error.

J. T. Wheeler and Blanton, Osborn & Curtis, for defendant in error.

BENNETT, C. This is an appeal from the action of the district court of Murray county, Okla., in refusing to vacate an order of the county court of said county admitting the will of Robert J. Vanderslice, deceased, to probate.

The appeal is prosecuted by Eliza Flynn, nee Vanderslice, the daughter of testator, Robert J. Vanderslice, deceased, against the executors and the heirs at law. The parties appear here in the same relative positions as they appeared in the trial court, and they will be so referred to as plaintiff and defendants. The plaintiff tried out her motion to vacate, first, before the county judge, who held against her; thereupon she prosecuted her appeal to district court, where the matter was heard de novo, and from an adverse finding there also, she appealed to this court. No question is raised as to procedure in county court, or in district court, and while defendants have filed in this court a motion to dismiss the appeal, we have, however, decided to consider the case upon its merits.

The order admitting the will to probate made by the county court was dated June 21. 1926, and was made in response to a petition therefor filed in said court by John D. Dougherty and E. C. Lehl, who were named executors in said will. The order appears formal disclosing notice ·published and served according to law, and the petition to vacate said order is in due form, and was filed September 14, 1926, and there is attached thereto as an exhibit a petition to contest said will. The said petition to vacate is in substance as follows: (1) That petitioner advised Jacob Vanderslice and other members of the family and the attorney for the executors that she would contest said will unless some arrangement were made whereby she should receive her right-

ful part in the estate. That she also talked with Judge Long, county judge, in whose court the proceedings for probate of the will were pending; that her brother Jacob told her that if she would not appear and contest the will, that he would see that she received her part of the estate, and that this statement was made to deceive and defraud her, and was relied upon by her, and by reason whereof she did not contest the probate. (2) That the attorney for the executors and the county judge informed her that she could contest the will at any time within one year. She does not charge said attorney or said judge with bad faith, but alleges that she was misled by their lack of full disclosure as to the law, and, but for which, she would have contested the probate. (3) That the order of probate was void because the court did not hear proof of the will as required by statute and admitted same to probate on the testimony of one subscribing witness.

The answers to said petition by the executors and the legatees and devisees were, in effect, general denials. After full hearing of the entire evidence, the county judge found against said petitioner and in favor of the executors, devisees and legatees. From this judgment appeal was taken to district court. Thereafter, upon de novo hearing of all evidence in the cause, the district judge found that the petition to vacate the order probating the will should be denied, from which judgment this appeal is prosecuted.

The following may be taken as the substance of the testimony: J. E Flynn, husband of petitioner: Robert J. Vanderslice died Friday, June 4, 1926, and was buried next day. Witness, as agent of his wife, talked with Jake Vanderslice, Bula Stone, Parlie Tate, and Maggie Vanderslice on Saturday and Monday about dividing the estate equally, and on Monday Jake Vanderslice and Robert Vanderslice, Jr., told witness they could find no will, but believed that there was one. Later had a conversation with Jake at the old home place; no one else was present. Witness told him if there were no will, he (Jake) should administer. He said "All right." That was Monday night following the funeral Saturday. No one else in the conversation. Did not talk with other members of the family about administering. Learned Tuesday noon decedent left a will. Mr. J. T. Wheeler, attorney for executors, told witness he would give him a copy of will next morning, and did so. Monday, about 1:10 or 1:15, shortly after Jake left the house, Parlie Tate

came to house of witness and said that Mr. Lehl told her that he and Mr. Dougherty were named executors of the will. She did not know what was in the will at that time.

"Q. When you had the conversation about his being administrator was after you found out about the will? A. Yes, sir. Q. And after he had found out about it? A. I don't know whether he found out. He told us he didn't know anything about it. * * * He said there might be one in some old papers. * * *"

After witness received the will, he went to Walter Stone's. Stone married Bula, one of the Vanderslice girls. Bula said, "It isn't fair, we all ought to have our part just the same." Witness went to Sulphur on Wednesday to retain Fielding, the attorney. He could not represent us; he was retained by the other side the day before. Witness then went to Pauls Valley to see Attorney Blanton, and then went to see Attorneys Bowling and Farmer. After that Jake said if they would not contest they would get more out of it. This happened several times at different places.

"Q. Did any other members of the family tell you about it? A. No, sir, only thing they say, they wanted her to have her part, that is for several days, and then they changed their attitude. Q. What was said, if anything, leading up to the proposition as to whether or not the will would be probated by Jake, or any of that, as to whether or not they would probate the will without contest? A. They never said nothing about it; they said if we wouldn't contest it, she would get more out of it, get more out of it. Q. Was anything said at that time whether or not the will would have to be probated to get it started? A. We had a conversation, all entering into the agreement, I having the agreement down here to place the will, let the will stand as to the contents of it except her, put her in. We would let him go ahead and act as administrator, give him so much and let her take $4,000, and they cut John Dougherty and Ed Lehl out; they still all get their part,—instead of her getting $6,000, give her four and Jake $2,000. He said that was perfectly satisfactory to him, that he sure needed money, he would like to act as administrator. Q. What was said whether or not the will would have to be probated in order to get ahead. * * * A. Jake says, 'I'll see the judge to-night about that, if that can be done.' he says, 'If can't we'll just go ahead after—there can't be nothing done anyhow, if he says nothing can be done we'll go ahead and probate the will, and then Mr. Dougherty when he will be in position to handle it, he can handle all this and fix it all up, there has to be a head to this thing, somebody to act as head.' Q. Did he do anything or say anything to anybody,

you and your wife not to appear here and contest the will? A. Well, we had confidence in him, he would do as was said all the time. * * *"

Witness had a conversation with Mr. Wheeler about June 12th; he wanted us to agree to take the deposition of Mr. Lawrence who wished to go on his vacation. Mr. Lawrence was one of the witnesses to the will. Mr. Wheeler said in front of drug store, "Well, you got plenty of time to file a contest suit, you got a year, you don't have to be down there now." Witness told Mr. Wheeler, "We are having a hard time getting ready to fight this case, to get this contest all up in shape," and he says, "You got plenty of time, you don't have to file it right now." Witness had the utmost confidence in Mr. Wheeler, and witness said, "That gives us more time to get ready." No one else was present. Later witness found out that the other heirs were objecting to witness' wife coming into her share. This was about two months after the will was probated. Jake told witness that nothing could be done until after the will was probated, but that afterwards they could make settlement. In August witness sent his wife to talk with Jake, and found out nothing could be done, and on the next day made arrangements to go ahead with suit. Witness had a conversation on the street with Mr. Cochran, the witness to the will, and asked him if he signed it. He said, "Yes, sir, I signed several of them." I says, "Do you know what was in that will?" He says, "No, Mr. Wheeler phoned me to come up. Bob Vanderslice made another will. I went up and he pitched it out to me, seen his signature on it; he says, 'I just signed it,' he said it was a customary thing. He said that no one else was in the office except Mr. Wheeler. Mr. Wheeler drew up the will."

Cross-examination: Witness's first conversation after the death of decedent was on Monday about one o'clock at witness's home. At that time Jacob said that he had not found the will, but thought there was one; that his father said so. Robert Vanderslice was with Jacob at the time.

"Q. What was said there about the estate, further, if anything? A. Well, there wasn't very much of anything. They all claimed, —he said they all share equal, will or no will. Q. I am trying to get at who said anything about sharing it there before they discovered the will, equally. A. Jacob. Q. What did he say? A. Well, he said, always been talk that he cut out Buster. Q. I mean what was said by Jacob. A. He said

all the children and everybody ought to share alike in it."

Robert was there when the conversation was had, and he said the same about sharing equally, and Maggie said it on Saturday night. Maggie is the wife of Walter and lives in western Oklahoma. Witness talked to Jacob about the 10th or 12th of June.

"Q. What was said between you and Jacob? A. I don't know. There was a whole lot said. Q. You don't remember what was said? A. Yes, sir, part of it. Q. About the estate. A. Well, I was telling him— he says—well now he says—I believe he says, we all ought to share in this thing, I'm going to do everything I possibly can, try to get it all fixed up; we'll all share in it. Q. What did you say,—what did your wife say? A. She said it was perfectly satisfactory. Q. That was Jake talking, was anybody there with him besides Jake? A. No, sir, just he, myself and my wife. Q. That was on Saturday, following the burial on Saturday; after and before the 21st, was there any other conversation between you and Jake? A. Yes, sir, he came back over again. Q. When was that? A. I think about Wednesday. Q. What was said then? A. Well, he came over, he said, 'Well, some of them don't want to divide this thing up, want to stick to the will.' Q. Who did he say? A. Mrs. Vanderslice. Q. What else? A. He said, 'But I think we can get it all fixed up if you folks don't sue, we'll get it fixed up,' he says, 'I believe I can handle it.' Q. At that time you learned Mrs. Vanderslice wasn't willing. A. Yes, sir. Q. Did you talk to him any more before the day of hearing? A. No, sir. Q. That's the last time you talked to him about it, that was about a week before the hearing? A. Yes, sir, about three or four days, on Wednesday, week before the hearing. Q. So you had three conversations with him,—did you talk to Robert any more after Monday at noon? A. No, sir. * * * Q. Did you talk to Mrs. Stone any more after Monday at noon. A. No, sir, but my wife talked to her. Q. It wasn't in your presence? A. No, sir. Q. Did you ever talk to the widow about her agreeing to anything? A. No, sir, never did."

Witness had a talk with Mrs. Tate, the sister of witness's wife. She was still wanting her to have her part. She says, "And if we can't get it, I'm going to split my part with you."

"Q. You wanted Jacob and them to divide up with you all? A. No, sir, we wanted to cut out Dougherty and Mr. Lehl from getting their ten per cent. We would take $4,000 for our part, and he get $2,000. It was— Q. You figured to divide what the administrators was to get and give it to your wife? A. Let him act as administrator, we take

$4,000, and get out of it. Q. You take $4,000 and get out, take that as administrator's fees? A. Yes, sir. Q. Not give the administrator his fees? A. He would get $2,000. Q. I meant the executors, Dougherty and Lehl? A. Knock them out, let Jacob act as administrator. It was perfectly satisfactory."

Jacob told witness that the administrator's fee was ten per cent. On the morning the will was probated, Mr. Wheeler called witness, and said, "Come, Jack, let's go; that probate comes up to-day." Witness was relying on Mr. Wheeler, and that he told witness that he could contest the will in a year.

Witness told him that he would take $4,000, and if they did not want to give that, he would take 120 acres of land which was in the middle of his place, but this was all after the will was probated.

"Q. Fact is, after the 13th or 14th of June, on Wednesday after the second Saturday, when you talked to Jacob, you never did talk to any of them after that except possibly to Mrs. Walter Vanderslice about settlement here, until the day of the probate the 21st of June. A. No, I thought it was all virtually settled, we would get our part. I was relying on Jake because he was handling everything. * * * Q. Did Mrs. Stone say she was willing to give her any part of her $4,000? A. No, sir. Q. Did Mrs. Tate say she would give her any part of the legacy given to her? A. Yes, sir. Q. How much did she agree? A. She never said. Jake told my wife the same thing, says, 'Parlie wants you to stick to the will.' * * * Q. When was it Jake told you he would give, agree he would give your wife $4,000 of the executors' fees? A. He never agreed he would give that. Q. What was said about it. A. He said she would get her part. Q. What was the statement about the $4,000 from the executors' fees you testified about? A. We kinda wanting to get something out of it; we made that agreement ourselves, we would take that."

Jake said that witness's wife would get her part.

"Q. Did he say what her part would be? A. No, sir. Q. Didn't say she would get as much as he would? A. No, sir, nothing said about it. * * * Q. Did Jake say he would see the executors. Dougherty and Lehl, wouldn't be appointed, they would give you their fees? A. We all talked we would make this agreement, and then let it go and have the will set aside. Q. When were you going to have the will set aside? A. Day it was probated. Q. If it was to be set aside, how come you not to come down here? A. Well, he said no matter what was done we would get her part of this. Q. You were relying altogether on Jacob? A. Yes, sir. I

figured he sure would stick to his word, because I sure claim to have stuck to him."

Witness talked with Judge Long on street about the will contest, and he said witness could contest at any time within a year.

Re-cross: The conversation witness had with Mr. Wheeler was on Saturday, the 12th of June. Maybe it was on the next Monday. It probably was on the following Monday that Judge Long had the conversation with witness.

Mrs. Eliza Flynn, wife of Jacob Flynn, and daughter of Robert J. Vanderslice, deceased: Witness had a conversation with Mrs. Walter Vanderslice on Saturday of the funeral. At that time witness did not know that there was a will. Mrs. Vanderslice said she had always heard that her husband and witness would be left out, and if it was true, she was going to see that everything was made equal. She was the wife of the brother that was killed. On the following Monday Jacob said there was no will, but that his father said there was one, and that they were going to look in some more papers. He came over to the house again about the middle of the week or maybe later. Witness then asked Jacob why he lied to witness about there being no will. Witness does not know just what he did say in reply.

"Q. You asked him why he told you there wasn't a will when there was? A. Yes, sir. Q. Did he say anything about what he was going to do with the estate? A. Well, he said. 'We all ought to try and divide the estate equally.' Q. Did he say anything about whether or not you would get any or wouldn't get any of the estate? A. Yes, sir. he said what to do,—get them altogether, that's what he said, get them altogether and make this agreement and share equal."

Witness did not see him any more until the will was probated. About two months after the will was probated, witness went over to see Jake at New Hope schoolhouse, and he said all of them had decided to stick to the will.

"Q. Did you talk to Mrs. Stone? A. Yes, but she said when I went out there at that time, she said, 'Well. when they get together and decide it, she never did give an answer, never did say, she said whenever they got together she was willing to do what was right. She never did say 'yes' or 'no.' * * * Q. D'd you ask him (Jake) why he had backed up on you as you said a while ago he wouldn't do what he said to that you should share in the estate? * * * A. Well I don't know whether he exactly said

that or not. He said they all decided to stick to the will. * * * Q. Now, that was at least ten days before the will was probated. A. I don't know whether it was or not, * * * Q. Did you ever talk to Mrs. Vanderslice? A. No, sir. Q. Did you ever talk to Robert after that? A. No, sir. Q. Mrs. Stone told you the same thing, when they got together she would give an answer. A. She never did say. Jake said I would get my part. Q. Mrs. Stone said she would give an answer when you all got together and decide about it. A. She said she wouldn't answer now. Q. She said she would answer it when they all got together and decided about it? A. Yes, sir. * ' * Q. In that conversation, Jacob didn't know there was a will? A. He said he didn't. * * * Q. When did you say you had another conversation? A. I told him I didn't know exactly. Just a few days after we had another one, a few days later. Q. That's when you were going to get together, the next conversation? A. Well, I think so. Q. Then you didn't have any more until after you went out to New Hope? A. Well, I don't think so. * * * Q. Did you know they come to town to probate the will? A. We asked Mrs. Walter, she stayed all night, we let her have our car to come down here, she had left our house. Q. You had notice that the will was to be probated that day? A. Yes, sir, we had. Q. You knew they came down here for that purpose? A. Yes, sir, when Mrs. Vanderslice left the house to come here for that purpose. * * *" Re-direct:

"Q. Mr. Blanton asked you about when you were going to get together, were you going to have a meeting with them somewhere about it after talking with Jake? A. He didn't say. He said they would all get together and see what they were going to do; he would see I would get my part. Q. He was going to handle it himself? A. He was going to handle it. * * *" Plaintiff rests.

Jacob Vanderslice, witness for the defendants: Witness is 37 year sold, schoolteacher; reared 11 miles north of Sulphur in Murray county; son of Robert J. Vanderslice. Remembers the date of Robert Vanderslice's death, June 4. 1926. On the Monday after his death went to see Mrs. Flynn about 11 or 12 o'clock. Robert Vanderslice went with witness. At that time witness did not know that there was a will. After remaining there 20 or 30 minutes Mrs. Flynn asked witness if there was a will Witness replied that if there was he knew nothing about it. Had not talked with her or her husband with reference to a contest of the will. Did not know that there was a will; had not learned from any source anything about a will, but did learn on Tuesday morning that there was a will. Did not

see Mrs. Tate on Monday. Witness went to Wynnewood on Tuesday. Was informed by Mr. Dougherty that there was a will. He and Mr. Ed Lehl were named in the will as executors. Witness did not read it at that time. Did not read the will itself until after it was probated, but saw a copy of it and learned its contents on Tuesday or Wednesday, but did not examine the original until after the probate. Next saw Mr. and Mrs. Flynn on Wednesday or Thursday. Went down at the suggestion of Mrs. Flynn to talk to her. They wanted to know what the witness was going to do about the will and what he thought about it. Witness said he was not going to do anything. He could not do anything. Nothing much was said about the property. Witness never made any promise upon any occasion as to what he would do if the will were not contested. It is not true that witness made a statement as to what witness would do if they did not contest. It is absolutely a false statement. Witness did not at any time promise that they would get their part if they did not sue. Never discussed the matter of making a compromise and had no authority from any of them to make such settlement. After learning the contents of the will and who the executors were, did not assume or try to compromise or settle it in any way. After the conversation on Tuesday or Wednesday, did not see them any more for two or three weeks. Saw Jack Flynn occasionally on the street. The only conversation witness had with Jack was one day when Jack was making some threats about what he was going to do. This was before the probate of the will. "He said they all, he told Andy Glenn and a fellow named Coyle—he says he (Jake) won't do anything, but I'll make it so d—— hot for him he'll have to."

"A. What was said about the will? He says, 'I aint having a damn thing to do with that.' * * * Q. That occurred in the streets of Wynnewood? A. Yes, sir. * * * I said she can bring suit if she wants to bring suit, she would get less than any other way out of it. I never did say nothing to her about it. * * * Q. You were under no obligations to Jack? A. None whatever."

Witness has not been particularly friendly with Jack. When Mrs. Flynn came out to see witness at the school, witness told her, "We have all agreed to let the will stand just exactly like it is because we can't do anything with it." I said, "We can't set it aside."

"Q. Did you ever promise Jack Flynn, or was there any discussion between you and Jack, you would set aside the will, take the

executor's fees, and do anything with them? A. No, sir, I never so mentioned. Q. Did you ever tell him you needed money, $2,000, you wanted the executor's fees? A. No, sir. * * * Q. Did you ever ask or indicate to Dougherty or Ed Lehl you didn t want them to serve as executors? A. No, sir. Q. Did any of the rest of you? A. No, sir, the whole family has utmost confidence in the executors. * * * Q. When was the first you heard anything about it, about executors' fees, giving it to Mrs. Flynn? A. To-day, that's the first I ever heard anything about taking any executors' fees; I didn't know what the fee was. Q. Did you tell Jack it was ten per cent.? A. No, sir." * * *.

Cross-examination: Was not there at the first trial.

"Q. You didn't discuss it (contest of will) at all prior to that time? A. No, sir. * * * Q. You never did that,—you tell this court what your sister said, and what you said to her down there, you would get the folks together, you would see that she got her part of the estate, you say that didn't happen? A. I never did tell her that. Q. That didn't happen in your presence at the house? A. No, sir."

W. G. Long, witness for defendants: Formerly county judge of Murray county; now district judge for this district. The only time the witness remembers having a conversation with Jack Flynn was during the summer. Does not know the exact time. Near the bank at Wynnewood. Spoke to Jack, shook hands with him. He said something about having a suit down there in my court about the contest of a will. Do not recall the conversation. Can't be certain about it. It might be that witness told him that the will could be contested at any time within a year. Cannot recall just what was said. No cross-examination.

J. T. Wheeler, living at Wynnewood; lawyer; been engaged in the practice of law 30 years. Filed a petition for the probate of the will. Discussed the matter a little with Jack; gave him a copy of the will. Told him that his wife had been given $1 under its terms. Does not recall that there was anything said about the time when a contest could be filed, either at that time or any other time. It might have occurred, but has no recollection of it. Witness recalls no statement made to him by Jack Flynn with reference to any effort to compromise. Saw Jack on the morning the will was probated. Witness was getting ready to go to the hearing of the petition for probate, and said, "Jack, let's go, that will is on probate to-day, or the hearing for the probate of the will;

it's time we were getting off." It was witness's impression that Jack was going to file some sort of contest. Jack replied that he was not going.

Cross-examination: Witness went to Mr. Flynn to get an agreement with his lawyers about taking deposition of a witness to the will who wished to go away on vacation, but Jack replied that he had no lawyers engaged that could make any agreement, so "We could not make any agreement along that line." That was the extent of the conversation.

"Q. I will ask you that at that time, if you recall that Jack was stating he didn't want to agree or something like that because he wasn't going to be ready? A. No, sir, Jack never said anything about not being ready, and he told me and I got the impression he wasn't going to contest. He said he hadn't employed attorneys. I said, 'Well I can't make any agreement about it'."

Re-direct: Witness says that at the time that Robert J. Vanderslice executed the will, the two witnesses, Frank A. Cochran and J. A. Lawrence, were in his office in Wynnewood, and that witness said, "I want you gentlemen to sign it as witnesses," and they were both there present. They signed in the presence of Robert J. Vanderslice, and in the presence of each other, and Mr. Vanderslice declared the document to be his will. That is the will in controversy, and is the last will of which witness has any knowledge, but Mr. Vanderslice made other wills prior to that time.

The testimony of Robert Vanderslice, Jr., is in substantial corroboration of the testimony of Jacob Vanderslice with reference to the conversations between Jacob and Mrs. Flynn and her husband. He denies that he ever suggested that there should not be a contest, and that no promise was made by him or Jacob to Mrs. Flynn with reference to probating the will.

Mrs. Rebecca Vanderslice, widow of Robert J. Vanderslice: Witness says that she never talked to Mrs. Flynn or Jack Flynn, or any of the rest of the heirs, with a view of giving her anything other than the will gave her, and never knew of any such discussions.

Mrs. Parlie Tate, sister of Mrs. Flynn and daughter of Robert Vanderslice, deceased: Witness had but one conversation with Mrs. Flynn; that was on Monday. Witness had just found that there was a will, but had not found out what was in it. Witness said she thought that Eliza Flynn had a right.

"Q. After that, did you ever propose to give them anything? A. I never said so. Q. Did you ever ask her not to contest it? A. No, sir. Q. You expressed your opinion that you thought she had a right. A. Yes, sir. Q. Did you try to get her or say anything to her with a view of getting her not to contest this will? A. No, sir." No cross-examination. Defendants rest.

H. W. Fielding, for the plaintiff: Attorney at law, living at Sulphur. Witness thinks on the 8th day of June, Tuesday or Wednesday, Mrs. Vanderslice, Robert, and Jake came to see witness concerning the will.

We have quoted very liberally and somewhat literally from the testimony. This evidence on the determinative and crucial points is in sharp irreconcilable conflict. It is the plaintiff's contention: First, that she was prevented from making a contest by an unfulfilled promise made by the heirs at law of Robert Vanderslice. If this testimony is to be believed, Rebecca, the widow, who was entitled to one-third of the property made no such promise. Mrs. Stone made no such promise, and we believe it can be said with equal assurance that Mrs. Tate made no such promise after the discovery of the will, and it seems that no more attention was paid to the promise, if any was made, by Robert, and he squarely denies making any such promise upon any occasion. Plaintiff relies upon the conversations had with Jacob, who, they say, did about all the promising. It must be remembered that Mr. and Mrs. Flynn, almost immediately upon the death of decedent, sought out various attorneys to protect their interests in the premises. It is, of course, possible, in these circumstances, that Jack and his wife would rely upon a promise as indefinite as the one to which they draw attention as having been made by Jacob, but it is highly improbable and against common experience. It is possible, too, that the lawyers employed by Jack and his wife would permit an arrangement of the kind suggested with no agreement as to anything certain, with no assurance that they were to get anything certain, with no agreement as to when they were to get it, or how. This, too, is against ordinary experience in business matters. It is possible, also, for lawyers and litigants to rely upon a promise as indefinite as the one that they describe as having been made by Jacob, where there is no showing or proof as to the authority of Jacob to act for the other heirs, and with the clear knowledge before them that some of these heirs had boldly asserted that they were not willing to give up anything, but this, too, does not comport with ordinary experience.

It is quite probable that immediately following the death of Robert Vanderslice, the heirs, brothers and sisters felt that there should be an equal division between them. It is quite probable that they said so in so many words, but at that time they did not know that their father had made a different disposition of his estate. After discovery of the will, and the fact that one of the sisters had been disinherited, it was perhaps natural that they should feel that their sister had been harshly dealt with, and it is not improbable that one or more of them suggested that if all could get together and could agree upon some more equitable division, it would be advisable. In fact, in the testimony of Jack Flynn and his wife, this very thing seems to have been the object sought—a coming together of all the heirs to try to see if some such division could not be arrived at. It certainly would seem to go without saying that Jacob Vanderslice could not dispose of the widow's part, nor could he made disposition of any part of Mrs. Stone's devise, nor the interest of any of the others. Jacob may have felt like doing the very thing that Mrs. Flynn says ought to have been done, but on Monday following the burial of the father on Saturday, Mrs. Flynn flatly accuses Jacob of lying to her about his knowledge of the will. It was not a happy way to promote an amicable adjustment, and about the same time Jack Flynn openly threatened to "make it so d— hot for Jacob" that they would have to be accounted to. This, too, is not a very encouraging way to bring about a friendly settlement. So that, thereafter they had no more communications. The will was probated.

We have read with care two or three times the testimony of Jack Flynn, and it occurs to us that it is anything but clear-cut and unequivocal. It is indefinite, uncertain and somewhat contradictory. It is met on the other side by direct, pointed and unqualified denial on the part of Jacob Vanderslice, who says that he never made any such arrangement, nor had any such conversation; that he made no such promises, had no authority to make such promises, and never for a moment contemplated the unique scheme detailed by Jack of having the will probated, then setting the will aside, cutting out the executors named in the will, claiming their fees, and using the same to pay $4,000 to Mrs. Flynn and the other $2,000 to Jacob for administering the estate. This evidence of Jacob is substantially cor-

roborated by the evidence of his brother Robert, Jr., of his sister Bula, and of Mrs. Vanderslice and Mrs. Stone. This will was probated in June. There were no more conversations between these parties until along in September, and then this proceeding is started. Twice these witnesses have been examined and their evidence taken, and the issue has been determined in favor of the defendants here: First, by the county court, and then on appeal by the district court in a trial de novo and in each instance these judges have had the benefit of observation of these witnesses. And now the plaintiff asks this court, upon this record, to overturn the finding on this testimony, which is in hopeless conflict, and when, as a matter of fact, the testimony of defendants appears the more reasonable since it comports more with the way in which ordinary business is conducted and with common experience. Second. Plaintiff claims that they were defrauded by the county judge and by attorney Wheeler in giving to the plaintiff insufficient information with reference to the time within which a contest of the will might be filed. It should be borne in mind, in this behalf, that judges of our courts are not supposed to discuss in detail with prospective litigants before their courts either matters of law or fact touching litigation upon which they are to sit. It is too much to suppose that Jack Flynn, in his passing remarks to the judge on that day in Wynnewood, disclosed the ground of his intended attack on the will, or took counsel of the judge as to the law applicable to those particular grounds of attack. The judge certainly would have had every right to suppose that Flynn had and would be guided by his own attorneys, even if that had not occurred in the first instance to Flynn. Plaintiff again says that he was defrauded in that he approached J. T. Wheeler, the attorney of the executors, and secured about the same answer from him. The same argument will apply here, and, in addition, it might be said in the brief of plaintiff neither of these parties is chargeable with any sort of wrongful intent. It should be observed too that information of this kind is usually sought from those who are friendly to and co-operating with those who make the inquiry. Mr. Wheeler has no recollection of this conversation, denies any knowledge of it, and says, moreover, that on the morning when the contest over the probate was advertised to take place, he invited Jack Flynn to go along with him to the trial.

Certain procedure is necessary in order to give courts efficiency, and in order to make their judgments sacred and binding. The average man knows generally that he does not get either from judges before whom litigation is pending, or from lawyers employed by his adversary, information with respect to his rights.

The parties in their respective briefs agree and cite authorities to the effect that this proceeding is in the nature of an equitable proceeding, and that, therefore, the finding and judgment of the trial court should not be disturbed unless it is against the clear weight of the evidence. Baldridge v. Smith, 76 Okla. 36, 184 Pac. 153; In re Will of Stires, Looman v. Carder, 92 Okla. 276, 219 Pac. 695; Bruce v. McIntosh et al., 57 Okla. 774, 159 Pac. 261; Choctaw Lumber Co. v. Waldock, 78 Okla. 232, 190 Pac. 866; Union Savings Ass'n v. Cummins, 78 Okla. 265, 190 Pac. 869; In re Will of Me-Hun-Kah, Carson, Adm'r, et al. v. Mills et al., 78 Okla. 214, 189 Pac. 867; In re Jepson's Estate (Cal.) 172 Pac. 1107; In re Johnston's Estate (Wis.) 175 N. W. 917. We have examined the evidence and the record, and we hold that the finding and judgment of the trial court is not against the clear weight of the evidence.

We have also examined the cases referred to by plaintiff, as to fraud, but we are of the opinion that they are not controlling here under the peculiar facts in this case. In most of those cases the party who is charged with withholding information is seeking some personal advantage thereby. It certainly was not in the mind of Mr. Wheeler, or of the judge of the county court, to take any advantage of Mr. or Mrs. Flynn.

The plaintiff sought to show, as grounds for contest of the will, that the same was not executed and witnessed according to law, and Mr. Flynn details a statement by Mr. Cochran which is contradictory of his sworn testimony presented in the record—also contradicted by the attestation clause of the document which he witnessed, and again by the statement of Mr. Wheeler, who, it seems, drew the will for Mr. Vanderslice.

Upon consideration of the whole evidence, and having carefully weighed the same, we find that the judgment of the trial court should be and is in all things affirmed.

HERR, HALL, REID, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.