ESTATE OF LAMBERT: STATE, Appellant, vs. JOHN, Respondent.

*January 13—February 17, 1948.*

For the appellant there were briefs by the *Attorney General* and *W. E. Torkelson,* assistant attorney general, and oral argument by *Mr. Torkelson.*

*M. S. King* of Wisconsin Rapids, and *Earl F. Kileen* of Wautoma, for the respondent.

HUGHES, J. The trial court found that on March 16, 1946, at Chicago, Illinois, George Lambert made and executed his last will and testament which was duly attested by Gustave Johnson and Walter Wedell; the will was last seen in Lambert's possession; it has been lost or cannot be found, and was not revoked by George Lambert before his death; Exhibit 1 is a copy of the will; George Lambert secreted or caused to be secreted Exhibit 1 in an album which he gave to Albert John at Chicago on March 20 or 21, 1946; John Van Ryn discovered Exhibit 1 in the George Lambert album on or about June 2, 1946; Albert John did not write or trace or cause to be written or traced the signature of George Lambert on Exhibit 1; Albert John did not type the typewritten matter on Exhibit 1.

The trial court also found that on six different occasions on five days between March 17th and March 28th George Lambert told witnesses who testified at the trial that he had made his will and left his property to John; on March 30, 1946, he wrote a letter to his friend Emma Schlosser, which he mailed from Wautoma on the morning of his death, evidencing a happy mood and stating that he had been well treated on his visit to Chicago.

The appellant attacks these last findings as findings of evidentiary matters and not of fact, and contends that the court,

having made these, should have made findings with respect to evidence offered by the objector, one of which items was that deceased told Ernest and Harriett Weber on Wednesday evening, March 27, 1946, that his wife's relatives would not get a cent of his money.

The trial court filed conclusions of law holding Exhibit 1 to be a copy of the will of George Lambert and ordered it admitted to probate. This appeal is taken from that order and decree.

The question as stated by appellant in its brief is :

Does it appear from all the credible evidence in the record that proponent has met the burden of overcoming by the quantum of proof required in such case the strong presumption which arises when a will last seen in the testator's possession cannot be found after his death that the testator destroyed said will prior to death with the intention of revoking it?

In his early years George Lambert had worked as an employee of the Chicago West Town Railroad Company. He retired on pension and lived with his wife at a cottage at Silver Lake about three miles from Wautoma. After his wife's death in 1944, he lived as a winter guest at the Chase Hotel in Wautoma.

At the trial the proponent offered proof that Lambert was a visitor at the home of Albert John in Chicago from March 14th to 21st. On the 16th, according to the testimony of Gustave Johnson, Walter Wedell, and Albert Wilcox, Lambert appeared at the shops of the Chicago West Town Railway Company where they were all employed and asked Johnson and Wedell to come to the cashier's office when they finished work, as he wanted them to do him a favor. He then waited in the cashier's office, where he told Wilcox that he wanted the other two to witness the execution of his will. When Johnson and Wedell arrived Lambert drew out an original and copy of an instrument, told them it was his will

and that in it he left everything to Albert John. Johnson read one of the copies, and all three signed it in the presence of each other.

Gordon A. Grantham, a tenant in a home in Chicago owned by Lambert, testified that when he went into service he had discussed buying the house and was told that he could buy when he came out. He had written to Lambert and on March 17, 1946, Lambert called at his home to conclude the sale. They agreed upon terms and closed the sale the next day. He further testified that Lambert told him on the 17th that he had everything taken care of except the house, that he had his will made out, put his hand to his pocket and said that he was giving everything to his brother-in-law Al.

Emma Schlosser testified that on March 20th or 21st she was in the Albert John home, that Lambert told her he was giving all of his property to Albert John and then gave an album to John.

Grace Dodson, a former nurse who had attended Mrs. Lambert during her last illness, testified that on March 26th Lambert met her on the street at Wautoma and told her that he had made a will and left everything to his brother-in-law Albert John. Thomas Kaminski testified that on March 28th Lambert made similar statements to him.

Upon the discovery of Mr. Lambert's body at about 6 p. m., in his room by the lady who operated the Chase Hotel, she notified Dr. Beck who came, made a brief examination, and called George Blader, the coroner. The room was then locked.

On April 2d the county court appointed Charles Taylor, an attorney and public administrator, to act as special administrator of the Lambert estate. After his appointment he and the coroner went to the hotel and searched Lambert's room. They searched rather diligently but found no will. They did find, either in the dresser or in one of the suitcases, a metal

box in which were deeds and other old papers, an instrument disclosing completion of the transfer of the Chicago house to Grantham, and a receipt showing payment of a bill for a purchase at Meyer & Wentke, Inc., Chicago, on the 14th of March, 1946.

On April 3, 1946, Albert John arrived from Chicago and he and Boyd Clark searched the cottage at the lake and found nothing.

The following Friday, which was three days later, Blader, Clark, and Taylor again searched the hotel room and at that time found in a shirt pocket a check for $4,400 payable to the order of Lambert and about $200 in cash.   They then told the landlady that the soiled shirt and a suit of underwear which had been worn were no longer needed, and she burned them together with a bed pad and spread.

At the time that Albert John came to the funeral he brought with him an album which he carried into the office of County Judge GAD JONES, where he made inquiry about proving lost wills and urged the judge to examine this album which had a sheet of paper in it with the tracing or outline of a key and which Mr. John insisted looked mysterious.   The judge also testified that Albert John made some remark to the effect that he was always generous to anyone who helped him.   When the judge showed no particular interest he took his album and left.   The state also offered evidence that the proponent tried to interest others in the album.

John Van Ryn, a resident of Chicago renting a floor of a building owned by Albert John, testified that he had known Mr. John for about seven years and that sometime in the early part of June, 1946, when he was entering the building he met John who was returning from Wautoma and that he went into Mr. John's office with him.   There he saw the album on the desk, inquired if that were the book that John had told him about, and when informed that it was, asked if he might exam-

ine it.   He then discovered little daubs or glue bubbles around the fly leaf over the back cover, inserted his pen knife, and out popped Exhibit 1.

The state insists that it is a phony, and from the record there would appear to be sufficient evidence to cause suspicion of fraud.

The state offered proof that prior to March 13, 1946, Lambert frequently told people around Wautoma that he would fix his property so his wife's relatives would get none of it.

The appellant produced a Mr. Henry C. Reich of Chicago, who had had some correspondence with Lambert and who was sought out by John on April 1st, 2d, or 3d in an effort to ascertain whether he had a will of Mr. Lambert.   When told that he did not have a will in his possession but that he did have a recent letter from Lambert, John asked to borrow it.   John took it with him, kept it for several weeks and had photostatic copies made of the envelope front and back.   It is the contention of the state that the signature of the deceased on the back of the envelope or a photographic reproduction thereof furnished the model for the tracing of the "Geo. Lambert" on the copy of the will offered for probate.

The state offered the testimony of a Chicago handwriting expert who was of the opinion that "Geo. Lambert," as it appears on the copy of the will, was a tracing by Albert John and also that the typed portion of the document was written by Albert John.   John denied under oath that he had written or tampered with Exhibit 1.

The trial court found that the signature was not written by Albert John and this court is of the opinion that its conclusion upon such highly conflicting evidence is controlling.

Apparently the state concedes that the proofs are sufficient to support the finding of the trial court that a will was in fact executed on March 16, 1946.   And without such concession we would not hesitate to so find.   Clearly the trial court had the right to believe the testimony of the proponent's witnesses upon that issue.

The evidence is set out at length because the objector maintains that it is insufficient to support the finding of the trial court that the will was not revoked.

The appellant contends that the testimony of Mr. and Mrs. Weber that Lambert told them he had cut off his wife's family, coupled with failure to find the original will, is of such force that all of the evidence of the proponent is insufficient to overcome it and the presumption which arises under the law.

The statutes involved are:

"Sec. 310.10 Whenever any will of real or personal estate shall be lost or destroyed by accident or design the county court shall have power to take proof of the execution and validity of such will and to establish the same. The petition for the probate of such will shall set forth the provisions thereof. The circuit court shall have the same power in an action brought for that purpose."

"Sec. 238.14 No will nor any part thereof shall be revoked unless by burning, tearing, canceling or obliterating the same, with the intention of revoking it, by the testator or by some person in his presence and by his direction, or by some other will or codicil in writing, executed as prescribed in this chapter, or by some other writing, signed, attested and subscribed in the manner provided in this chapter for the execution of a will; excepting only that nothing contained in this section shall prevent the revocation implied by law from subsequent changes in the condition or circumstances of the testator. The power to make a will implies the power to revoke the same."

The testimony was in sharp conflict and if the trial court who saw the witnesses believed the testimony which was favorable to the proponent, it was sufficient to support its finding. Mr. and Mrs. Weber were in Wautoma practically every Wednesday, and the trial court had the right to discredit their testimony if it believed that they were mistaken as to the date. It would have been more helpful if the court had written an opinion stating the grounds upon which his decision rests, but in the absence of that this court must indulge all reasonable inferences from the evidence which will support the trial court's decision.

The state attaches great importance to the fact that the will was not found in the "strongbox" in the deceased's room inasmuch as there were other papers which had been deposited in the box by Mr. Lambert after his return from Chicago. It is worthy of note, however, that the check for $4,400 obtained at Chicago was in the shirt pocket of the deceased, so that the absence of the will from the box would not preclude the trial court from concluding that it had not been destroyed.

Appellant cites *Dalbey's Estate* (1937), 326 Pa. 285, 192 Atl. 129; *In re Ascheim's Will* (1912), 75 Misc. 434, 135 N. Y. Supp. 515; and *Scott v. Maddox* (1901), 113 Ga. 795, 798, 799, 39 S. E. 500, 84 Am. St. Rep. 263, all to the effect that where there is an opportunity for the testator to destroy the will prior to death, the presumption of revocation is not overcome.

In the last case the court said that so far as the record disclosed the will was never seen after its return to the testator by the executor, Varner. A few days before his death the testator told Varner that the will was in a chest which he pointed to with his finger. He said to Varner that he wanted him to see that the provisions of the will were carried out after his death. The testator was unconscious for several days before he died, but the court said the evidence did not show he fell into this condition immediately after the statement to Varner. The court said:

". . . It does not seem that the evidence was sufficient to overcome the presumption which arises in such cases. It not having been shown that the testator lapsed into a state of unconsciousness immediately after the declaration to Varner that he desired his will to be carried out and that the paper would be found in a certain place, the evidence in behalf of the propounders did not preclude the possibility of the testator's having formed an intention to revoke the will and carried such intention into effect by having the same destroyed between the time that he made the statement to Varner and the time that he lapsed into the state of unconsciousness which preceded his

death.   This being so, there was no error in refusing to establish the copy offered as the last will of Ezekiel Reeves and to allow the same to be admitted to record."

The presumption created by the loss of a will has not been regarded to be so strong by this court.   In most of the cases where a lost will was established there was opportunity for the testator to have destroyed the original will during lifetime. *Will of Lauburg* (1920), 170 Wis. 502, 175 N. W. 925; *Wendt v. Ziegenhagen* (1912), 148 Wis. 382, 134 N. W. 905, and cases there cited.

In the case of *In re Valentine's Will* (1896), 93 Wis. 45, 54, 55, 67 N. W. 12, there was evidence of rumors in June, 1893, that testatrix had destroyed or was intending to destroy her will.   She died July 10, 1893.   Witnesses testified on the trial as to certain declarations of Mrs. Valentine to the effect that she had not destroyed her will but still had it in her possession.   On the other hand the trial court excluded the testimony of several witnesses on the part of the contestants as to declarations made by Mrs. Valentine to the effect that she had destroyed her will.   The court said:

". . . Where, as here, it is established that the testatrix properly executed a valid will, and the same was last known to be in her possession but cannot be found on her death, there is a *prima facie* presumption that she destroyed it with the intention of revoking it, but such presumption may be overcome by competent evidence.   *Id.* secs. 314–320, 356–367, and cases there cited.   Of course, if such subsequent declarations are admissible in evidence to overcome such presumption, they are also admissible to support such presumption. . . ."

The trial court received proof by the state that prior to March 13, 1946, Lambert frequently told people around Wautoma that he would "fix his property so that his wife's relatives would get none of it."   These statements were all made before the execution of the will, and the trial court had the right to conclude that they constituted weak evidence.

The evidence of the proponent, having established that the deceased made a will and persisted in statements of satisfaction with its contents up to the day of his death, is sufficient to sustain the finding of the trial court that the presumption of destruction was overcome.

*By the Court.*—Judgment affirmed.