WILL OF DONIGIAN: GULBANKIAN, Appellant, vs. SALBASHIAN, Respondent.

*October 8—November 3, 1953.*

148

For the appellant there were briefs by *Heft, Brown, Stewart & Coates* of Racine, and oral argument by *Carroll R. Heft* and *Glenn R. Coates.*

For the respondent there was a brief by *La France, Thompson & Zahn,* attorneys, and *Alfred E. La France, Edward J. Zahn, Jr.,* and *Louis Hardy* of counsel, all of Racine, and oral argument by *Alfred E. La France* and *Edward J. Zahn, Jr.*

BROWN, J.   On August 7, 1951, Mr. Donigian executed three identical wills, drawn by his attorney, Mr. Gulbankian.

One such will he took home. The other two were left with the attorney, and one of them was offered for probate after the death of Mr. Donigian which occurred January 10, 1952. The proponent is the executor named in the will, who is also a legatee and the sister of the scrivener. The material facts are not in dispute and the issue is one of law.

For several months before Mr. Donigian's death his nephew, Charles Salbashian (the contestant of the will), and Charles' wife lived with Mr. Donigian and cared for him. After the latter's death the Salbashians and a relative of theirs searched among Mr. Donigian's papers and effects for a will and found none. Charles is a legatee also but, as the testator's only heir at law, he will take the entire estate if it is determined that Donigian died intestate. The trial court held that the failure to find a will known to have been in the possession of the testator when last seen created a presumption that the testator destroyed it with intent to revoke it, and the proponent's evidence was insufficient to rebut this presumption. Having thus concluded that the one will was so revoked the trial court extended such revocation to the two equally authentic ones retained by the scrivener. Probate was denied accordingly and the proponent has appealed.

The material part of sec. 238.14, Stats., provides:

*"Wills, how revoked.* No will nor any part thereof shall be revoked unless by burning, tearing, canceling, or obliterating the same, with the intention of revoking it, by the testator or by some person in his presence and by his direction, or by some other will or codicil in writing, executed as prescribed in this chapter, or by some other writing, signed, attested, and subscribed in the manner provided in this chapter for the execution of a will; . . ."

We have not been able to discover that it has been directly held in Wisconsin that if a testator revokes one of several duly executed, identical wills by destruction, the revocation extends to the others, but we have indicated that this is the

law. In *Will of Wehr* (1945), 247 Wis. 98, 18 N. W. (2d) 709, a mutilated conformed copy of a will was found in the testator's desk, and we said (p. 110): "It is clear enough that if this had been a duplicate, a destruction of it would generally be held to create a rebuttable presumption of intent to revoke the will." Citing authorities. While this was dictum it was a considered statement, preliminary to the distinction which the court went on to draw between multiple originals and mere copies of an executed will. Persuasive arguments can be made against extending the effect of the destruction of one original to the untouched others but the rule is generally recognized and applied. Note, 17 A. L. R. (2d) 809–815. We recognize it now and hold that if it is established that the testator destroyed the will in his possession with intent to revoke it, such revocation also revokes all duplicates or triplicates of the one destroyed. The admissibility to probate of the duplicate kept by the attorney depends, then, on finding whether or not the testator revoked that will which he kept.

The presumption of revocation by destruction which arises from the failure to find a will last known to be in the testator's possession is well established in this state. The trial court, however, was in error in its expressed belief that evidence clear and strong and greater than a mere preponderance was required to overcome the presumption. We dealt with the effect of such presumptions in *Will of Faulks* (1945), 246 Wis. 319, 349, 17 N. W. (2d) 423, saying:

"When some evidence to the contrary is received, that is, evidence which if uncontradicted is sufficient to support a finding, the presumption is destroyed or removed—it then has no probative force. The matter is then to be determined upon all the facts freed from the presumption."

Since the learned trial court gave the presumption of destruction, *animo revocandi*, greater weight than it was entitled to, we are required to reverse its decision. The question

then is whether the cause should be remanded with directions to the trial court to re-examine the evidence, giving to the presumption no more effect than the rule of *Will of Faulks, supra,* authorizes, or whether the record here is such that we may reach a decision as a matter of law. Since the evidence is not in dispute we consider that we should adopt the second course.

In *Estate of Lambert* (1948), 252 Wis. 117, 31 N. W. (2d) 163, the testator made a will on March 16, 1946, and it was last seen in his possession. He died two weeks later and the will was never found. In the interval he told several people how he had disposed of his property. We held that the presumption of revocation which arises from nonproduction of a will is not so strong in this state as to require the proponent to prove that the testator had no opportunity to destroy the will, and we said (p. 126):

"The evidence of the proponent, having established that the deceased made a will and persisted in statements of satisfaction with its contents up to the day of his death, is sufficient to sustain the finding of the trial court that the presumption of destruction was overcome."

In *Wendt v. Ziegenhagen* (1912), 148 Wis. 382, 134 N. W. 905, the testator made his will in 1900. He died in 1909. He had possession of the will but it was not found after his death. His son who would profit by an intestacy and his widow, who sided with the son, had access to his papers. The court did not consider the question of the possible destruction of the will by interested parties but rested its decision upon the frequent statements of the testator to the effect that he was satisfied with his will and the absence of any change in conditions which would make it likely that he would revoke the will in order to give greater benefits than the son had already received. Such evidence was held to be sufficient to overcome the presumption and to support a

finding that the testator did not destroy his will with intent to revoke it.

In *Will of Lauburg* (1920), 170 Wis. 502, 175 N. W. 925, the testatrix up to the time of her death made declarations tending to show the existence of her will and that she had no intention of revoking it. We held that this evidence was strong enough to rebut the presumption and support a finding that the will had not been destroyed by the testatrix with intention of revoking it.

Mr. Donigian made many wills during his lifetime. All but one of these were drawn by his friend, Attorney Gulbankian. It is clear that when Donigian became dissatisfied with a will his custom was to replace it with one more to his liking. The later wills in the series made generous provision for his nephew Charles Salbashian, and all of them made bequests to various Armenian charities. Mr. Donigian also had a very close association with his attorney, Mr. Gulbankian, and the latter's sister Akabe Gulbankian. In 1946, in evidence of this feeling, he gave Miss Gulbankian a deed to his home reserving a life estate, but asked her not to record it. On July 27, 1951, Charles and Mrs. Salbashian came from Massachusetts to live with Mr. Donigian. On August 6, 1951, Mr. Donigian asked Akabe Gulbankian to give him back the deed, explaining that he wanted to leave the home to Mr. and Mrs. Salbashian so that they would have a home after his death. Akabe returned the deed and on August 7, 1951, Mr. Donigian made the will in question, devising the home to Mr. and Mrs. Salbashian. On Christmas Eve, 1951, while Mr. Gulbankian and others were calling upon Mr. Donigian, Donigian said to him, "I am glad that Akabe is satisfied with the arrangement that I gave the house to Charlie in this August 7th will, in the will." This was the only will in which the house was left to Charles Salbashian. It is not controverted that Donigian made this statement and it is a very clear demonstration that within

three weeks of his death the testator was satisfied with the provisions of his most recent will. There is no evidence whatever of any change in circumstances or any change in Donigian's mental attitude after that conversation to warrant an inference that he became dissatisfied.

Respondent's counsel submits that in November, 1951, Donigian indicated that the August 7, 1951, will had been revoked. The testimony on this subject was that in November one Baroolian, who had witnessed a 1946 will, asked Donigian what had happened to it. Donigian replied that it had been replaced by one executed in May, 1951, at the bank. This was the literal truth. He did not say, as counsel claims repeatedly, that his *last* will was the one at the bank. If he had said it, it would have been untrue, for at the time of the conversation the May will had been revoked by the one executed in August with which, as we have said, he appeared content in December. We can see no significance in the conversation. Baroolian's question was answered directly and truthfully. If Donigian did not care to go further and discuss still later wills with a person who had no legitimate interest in the subject, we cannot draw any conclusions from such reticence.

We consider, further, that the very existence of the presumption we have been discussing depends on the tacit assumption that a diligent search was made for the will by persons trying to find it. We are far from charging that the contestant and his associates did not search in good faith and there is no evidence but what they did; but whatever virtue the presumption created by a failure to find may start with, that virtue is seriously diminished when it must depend on a search made by those whose interests will be impaired by production of the will. As we said in *Gavitt v. Moulton* (1903), 119 Wis. 35, 49, 96 N. W. 395:

"True, the mere fact that the contestant had an opportunity to destroy the will would not of itself overcome the

presumption that it was destroyed by the testator with the intent to revoke it; still it is a circumstance to be considered with other proof."

We conclude that undisputed testimony here is sufficient to support a finding that the August 7th will was not revoked by the testator by destruction or otherwise. There is no testimony whatever that he did so revoke it,—nothing but a presumption that he did so arising from the nonproduction of the will,—and that presumption went out of the case when evidence came in that during Donigian's final days he referred to his will with satisfaction, that no change of intent was ever manifested, or cause for such change arose, and that his papers and effects were so situated that others than himself had access to them.

We conclude that the order denying probate to the will of August 7, 1951, must be reversed.

*By the Court.*—Order reversed and cause remanded with instructions to admit to probate the will of Esgender Donigian dated August 7, 1951.